**EXHIBIT D**

WALTER SIGNORELLI, ESQ.
1992 Commerce Street
Yorktown Heights, New York 10598

July 29, 2011

Law Office of Todd J. Krouner
93 North Greeley Avenue
Chappaqua, N.Y. 10514

Re: De Michele v. City of New York, County of Westchester, et al.
U.S. District Court, Southern District of New York, 09CV9334

Dear Sir/Madam:

1. In my professional opinion, the New York City Police Department ("NYPD") and the Westchester County Department of Public Safety ("WCPD"), and the individuals named in this action, disregarded plaintiff's civil rights, arrested, beat and maliciously prosecuted plaintiff.

2. Pursuant to plaintiff's request and in accordance with Federal Rules of Civil Procedure, Rule 26 (a)(2), I have prepared this report, which constitutes my initial evaluation and opinion within a reasonable degree of professional certainty of the actions and procedures employed by members of the NYPD and the WCPD in connection with this matter. My fee for preparation is $300 per hour and $2400 per day or part thereof for deposition or trial testimony. This evaluation is written on the basis of a review of the documents provided and my experience, training, education, and professional background, which are described below. I reserve the right to revise this opinion upon the receipt of additional information.

3. I am a retired member of the NYPD, having served for more than (31) thirty-one years. During my tenure, I held the ranks of Police Officer, Sergeant, Lieutenant, Captain, Deputy Inspector, and Inspector, and served in numerous capacities, including patrol officer, patrol sergeant, anti-crime sergeant, lieutenant tour commander, Executive Captain of the 46th Precinct, Bronx; Commanding Officer, Manhattan North Public Morals Division; Commanding Officer of the 79th Precinct in Bedford-Stuyvesant, Brooklyn; Commanding Officer, Staff Services Section of the Personnel Bureau; Commanding Officer, 24th Precinct., Upper Manhattan; Executive Officer, Bronx Narcotics Division; Commanding Officer, License Division; Executive Officer, Narcotics Division; Executive Officer, Manhattan North Narcotics Initiative; and Executive Officer, Brooklyn South Detective Division.

4. During my tenure, I conducted or supervised thousands of investigations and arrests. All of the positions noted above entailed training and supervision responsibilities regarding arrests, investigations, and interviewing witnesses and suspects.

1

5. Since my retirement from NYPD, I have taught police science and criminal law courses at John Jay College of Criminal Justice and St. John's University, including courses in police administration, criminal investigations, constitutional law, and criminal procedure law. I have been retained as a consultant by both plaintiffs and defense in a number of police liability cases, and have testified as a police procedures expert in both State and Federal courts.

## MATERIALS REVIEWED

6. The following is a list of materials pertaining to the incident and individuals involved that I reviewed thus far:

a. Complaint, 11/10/09;
b. Letter of Hon. Paul G. Gardephe, 2/22/10;
c. Plaintiff's sealed criminal record;
d. NYPD Sprint report, 1/18/09;
e. NYPD Arrest report;
f. Memo books for NYPD Officers DeCarlo and Nyberg;
g. Westchester County documents, Bates stamped 25 through 149;
h. Westchester County Amended responses to plaintiff's second request for documents;
i. Westchester County documents, Bates stamped 150 through 235;
j. WCPD SIU Investigation Report (Sgt. Reich);
k. WCPD Case Report #00164-09 (Detective Fumuso);
l. WCPD Use of Firearms/Force Reports of Officers Serlin, Tierney, and Gutierrez;
m. Memo books of WCPD Officers Tierney and Lieberman;
n. WCPD Aviation Unit Mission Request report and Mission Debrief reports;
o. Deposition transcript of WCPD Detective Fumuso, 5/14/10;
p. Deposition transcript of NYPD Officer DiCarlo, 5/27/10;
q. Deposition transcript of NYPD Officer Nyberg, 6/16/10;
r. NYPD Command Log, dated 1/18/09;
s. Deposition transcript of WCPD Officer Tierney, 7/7/10;
t. Deposition transcript of WCPD Officer Lieberman, 7/8/10;
u. Deposition transcript of WCPD Officer Ruiz, 7/12/10;
v. Deposition transcript of WCPD Sergeant McGuiness, 7/12/20;
w. Letter of ACC Nguyen, 7/19/10, with enclosures, Bates stamped NY 97-119;
x. Deposition transcript of NYPD Lieutenant Crespo, 7/15/10;
y. Deposition transcript of NYPD Sergeant Guenther, 7/14/10;
z. Deposition transcript of NYPD Sergeant Mellusi, 7/14/10;
aa. Letter from ACC Nguyen, 8/4/10, with enclosures Bates NYC120-368;
bb. Deposition transcript of NYPD Captain Urprasad, 9/28/10;
cc. Deposition transcript of NYPD Detective Fennell, 9/23/10;
dd. Plaintiff's First Amended Complaint, 11/9/10;
ee. Deposition transcripts of plaintiff, Frank DeMichele, 5/13/10 and 8/25/10;

2

ff. Deposition transcript of ADA Cheryl Thill, 12/20/10;
gg. Deposition transcript of Officer Richard Pucillo, 1/10/11;
hh. Deposition transcript of Officer Laurismano Laureano, 1/11/11;
ii. Deposition transcript of Officer Mitchell Serlin, 1/31/11;
jj. Deposition transcript of Officer Christian Gutierrez, 1/6/11 and 1/10/11;
kk. Deposition transcript of Officer Michael Brady, 3/31/11.

## SUMMARY OF FACTS AND CIRCUMSTANCES

### The Car Chase

7. According to the NYPD and WCPD documents and testimony, on January 18, 2009 at about 0035 hours, WCPD Officer Gutierrez attempted to stop a white 2009 Mercedes-Benz, registration EHH-6968 (the "Suspect Vehicle") that was proceeding northbound on the Hutchinson River Parkway (HRP) in Westchester County. The driver of the Suspect Vehicle, later identified as Frank Desideri, accelerated away from the officer, and a vehicle pursuit ensued. The Suspect Vehicle exited and re-entered the HRP, proceeding southbound. During the pursuit, the Suspect Vehicle struck a WCPD police car driven by Officer Brian Tierney, but Frank Desideri left the scene of the collision and continued to flee.

8. A WCPD helicopter monitored the pursuit and followed the Suspect Vehicle southbound on HRP to 1164 Edison Avenue, a multi-family residence in the Bronx (the "Location"), where plaintiff Frank DeMichele resided with his mother and infant brother. From the helicopter WCPD Officer Lieberman observed the driver, wearing a black cap, shirt, and pants, enter the rear yard of 1164 Edison Avenue and apparently enter that building, though the officer did not see him go into the door. He also observed that no one exited that location until other police arrived. (Lieberman 121:9-15). The WCPD audio transmissions indicate that Officer Lieberman was unsure whether the suspect went into the door or between buildings. The officers in the helicopter failed to record the pursuit with the helicopter camera although it appeared to be working. (Lieberman 57:12-15). Officer Brady, the tactical flight officer, testified that he would have assisted in operating the helicopter camera, but he had not been trained in the use of helicopter camera or how to troubleshoot the camera. (63:2-14; 64:13-22).

### Arrest and Identification

9. Several WCPD officers arrived at the Location, including Sergeant McGuinness and Officers Gutierrez, Ruiz, Serlin, and Tierney (45:13-14). The WCPD officers intended to arrest the driver of the Suspect Vehicle for crimes relating to the vehicle chase in Westchester County. However, several NYPD officers were already present. As WCPD Officer Tierney testified, when he arrived at the rear of the building, three NYPD officers were at the "vestibule" area, of the rear door of the Residence. One officer was wearing a white supervisor's shirt (52:12-15). According to other police testimony and records, the NYPD officers present included Deputy Inspector Bugge,

3

Captain Urprasad, Lieutenant Crespo, Officers Laureano, DiCarlo, and Nyberg. (Crespo: 224:9-10.)

10. In his deposition WCPD K-9 Officer Mitchell Serlin testified that as NYPD officers took DeMichele up the steps, DeMichele resisted arrest by flailing his arms and kicking. Officer Serlin stated, "And then some of the Westchester officers that were up top, assisted New York City to try to control the subject at that point." (Serlin: 20:7-13).

11. Officer Serlin gave a statement to WCPD Detective Fumuso, who had been assigned to investigate the vehicle accident and pursuit. Detective Fumuso's report indicates that Serlin responded to 1164 Edison with a WCPD bloodhound, and "Serlin stated . . . he was asked by an NYPD captain to run a track from the suspect vehicle . . . Serlin stated he introduced K-9 bloodhound Gracie to the driver seat of the suspect vehicle . . . Gracie led him to the rear door of 1164 Edison Avenue . . . an NYPD captain told him to standby so they (NYPD) could knock on the rear door of the building. . . . [H]e was told to stay to the side with the dog . . . a white male (later identified as DeMichele) came to the door . . . and then the NYPD personnel grabbed the white male and pulled him outside." In his deposition, Officer Serlin testified that Gracie "started to go down a set of stairs that led to . . . a basement apartment. At that point I was stopped by the New York City superior officer." The officer confirmed that Gracie never went to the door itself. (Serlin: 15:3-25). Captain Urprasad, when asked about the K-9 tracking to the door, testified, "I don't remember." (152:6-15).

12. According to WCPD Officer Tierney, NYPD Captain Urprasad directed him to stand guard around the house. Tierney was then directed to return to the vestibule area to identify a male. Tierney testified that he observed "a white male fitting the description of the individual driving the Mercedes in boxers and a tank top. He was coming up the stairs. . . . [H]e looked like the gentleman driving the car. I identified him as the individual driving the car." (Tierney: 62-63:20-23, 2-4). Tierney first saw the male on the top steps coming out of the basement apartment, with two or three NYPD officers around him. (Tierney: 69:20-25). This male "was being held by the officers" (Tierney: 71:24), and "He was resisting, coming up the stairs, so they had to restrain him and bring him up." (Tierney: 72:19-20).

13. Officer Serlin testified that after the arrest and handcuffs had been placed on DeMichele "At that point he was walked away from the residence, and I asked the officers to stop him so that I could see if Gracie could indicate, and she was able to indicate that his scent was contained within that vehicle." (23:8-12). However in his report to Detective Fumuso, he did not state that Gracie had indicated on the person of DeMichele. (Serlin: 87:2-5). Also, Captain Urprasad, when asked about the K-9 indicating on the plaintiff, testified, "I don't remember." (153:10-15).

<u>Excessive Use of Force</u>

14. The plaintiff, along with his mother, Margaret Bonura, and his girlfriend, Diana Brescia, were present in the apartment when the police arrived. According to their

4

statements, the police officers punched the plaintiff, slammed his head into a brick wall, stomped on his bare feet, ran him into a metal gate, and used handcuffs in a manner that injured him. The police dragged the plaintiff out of the apartment even though the temperature was 13 degrees Fahrenheit, and he was dressed only in his underwear and was not wearing shoes or socks. While plaintiff was handcuffed and he was under the control of the officers, he was pushed to the ground. Photographs depict injuries on the plaintiff's body. Also, photographs of the plaintiff, apparently taken while he was in custody at the 45th Precinct, show bandages on his leg.

15. According to police testimony, WCPD Officer Gutierrez was present as the NYPD officers took DeMichele up the steps, and Gutierrez gave him orders to stop resisting and to place his hands behind his back. (Tierney: 73:18-23). According to the police, DeMichele nevertheless resisted arrest by moving his body back and forth and flailing his arms. On ground level above the steps, Officers Gutierrez, Ruiz, and other officers forcefully placed handcuffs on him.

16. Other police accounts differed. Captain Urprasad testified that he saw DeMichele on the ground outside the house prior to being handcuffed and several officers were around him. (68:10-21; 69:16-18). Captain Urprasad stated that DeMichele was on the ground where he was handcuffed. (131:3-6).

17. NYPD Lieutenant Crespo gave testimony that was inconsistent with other police testimony, including the testimony of WCPD Officers Serlin, Gutierrez, Tierney, and NYPD Captain Urprasad. The Lieutenant testified that DeMichele had been handcuffed in the vicinity of the doorway before he was taken up the stairs, and Diana Brescia's statement confirms this. (Crespo: 80:10-18; 71:12-22).

18. According to the testimony of WCPD Officer Ruiz, he assisted in the handcuffing by "using an arm bar." (Ruiz: 41:4). After DeMichele was handcuffed, they made him walk across icy ground while dressed only in his under-shorts and without socks or shoes to the police car in which he was placed in the back seat. During the walk across the icy ground, DeMichele struck the ground, either because he fell or was thrown down. Officer Ruiz testified, "I don't know if he was attempting to run away, but during the trashing back and forth he broke free from my grip. At his point in time he took a couple of steps forward, fell on the ground." (Ruiz: 47:6-10). The plaintiff testified that he was thrown to the ground. (DeMichele: 148:14-16).

19. Officer Ruiz stated that he used "cuff control" to place DeMichele in the police car. He explained that cuff control is "When handcuffs are placed on the suspect, you twist the handcuffs at a pressure point on the wrists... Basically using pressure points to gain compliance... It's twisting either further or backwards on it... The handcuffs are on his wrists in that area." (Ruiz: 84-85:24-25, 1-20).

20. DeMichele was placed in a WCPD patrol car operated by Officer Gutierrez. Officer Serlin testified that after DeMichele had been placed in the police car, he received a pair of socks from the plaintiff's mother. The officer testified that he placed the socks

on DeMichele's feet, and admitted that he was not concerned that the plaintiff was a
flight risk or that the plaintiff might kick him as he was doing so. The officer also
testified that as he was placing the socks on the plaintiff's feet, he noticed blood on
DeMichele's face. (Serlin: 33:17, 31:19)

21. Sometime later, DeMichele was transported in the WCPD patrol car to the
45th Precinct Station House in Bronx County, where DeMichele was placed in a holding
cell. While he was at the precinct, EMS treated and bandaged his injuries. However, the
desk officer, Sergeant Mellusi failed to note in the command log that such treatment
occurred. Additionally, the arrest report failed to note the plaintiff's injuries, but listed
his condition as "good." This report of "good" was made despite WCPD reports of
Officers Tierney, Gutierrez, and Serlin that confirm an injury to the plaintiff's forehead,
and also despite the plaintiff's statement that he was punched in the face by Captain
Urprasad and that he suffered wrist and shoulder injuries when the police picked him up
twice from the ground by his handcuffs. Captain Urprasad, when asked whether he had
punched the plaintiff, did not positively deny doing so, but stated only, "No, I do not
remember it happening." (66:14-17).

### Failure to Investigate Desideri as the True Suspect

22. Throughout the incident DeMichele denied that he had done anything wrong,
and Officer Serlin testified that the DeMichele was adamant that he was "not the guy."
(32:11-18).

23. Ms. Bonura, the plaintiff's mother, stated that she told the officers that the
person that they were looking for (later identified as Frank Desideri) had run through her
apartment and was still in the building. However, the officers did not follow up on her
information and did not look for Desideri.

24. Officer Serlin confirmed Bonura's statement. He stated in his report that
Bonura approached him and "I then spoke with her [the mother] briefly in which she
stated that a guy had run through her apartment, which she reluctantly stated was her
landlord's kid [Frank Desideri]." In his deposition, he stated that the mother said "You
got the wrong guy." When he asked her who it was she stated "I can't tell you." (34:5-22;
41:19-25). Serlin assumed the mother was lying to protect her son, and when other
WCPD officers asked him what she said, he told them, "I believe she is lying for him."
(44:2-6).

25. Police testimony confirms that no one asked for Ms. Bonura's permission to
enter her apartment, or the building at 1164 Edison Avenue, to search for Mr. Desideri.

26. In his deposition Sergeant McGuinness denied that the mother told him that
the person they were looking for was upstairs and denied that he told WCPD Detective
Fumuso that such an incident occurred (249:6-9); however, Detective Fumuso took notes
of the interviews he conducted and included in his investigation file that he had
interviewed McGuinness on January 20, 2009 and that McGuiness related the following:

6

> [H]e related to me that Mrs. DeMichele [Bonura] had said the person
> you're looking for is upstairs or words to that effect... But that nobody
> believed her because this is something that somebody would say, you
> know, to dissuade the arrest of, in this case, her son. (Fumuso 139:10-15).

Whether Sergeant McGuinness learned of Bonura's contention directly from her or indirectly through Officer Serlin (who admitted that he told other police officers of the statement, and normal procedure would have been for Serlin to tell Sergeant McGuinness), the officers did not search for the true suspect.

27. While the officers were at the scene, two adult males separately arrived at the scene. Officer Serlin spoke to the first male, Tristano Rivieccio, and obtained his license. Mr. Rivieccio said he was related to Mrs. Bonura. As Officer Serlin and Rivieccio were talking, the second male, apparently the father of Frank Desideri, passed them, and as he headed toward the Suspect Vehicle, he asked, "Who was driving my car?" Revieccio responded "Little Frankie."(89:12-19). At that point, the police asked Revieccio to leave because as Officer Serlin testified, "Because we didn't need him there causing any problems, if there was going to be any, so we just asked him to leave and he followed." (49:22-25).

28. Sergeant McGuinness testified that shortly after his arrival at the scene, a male approached him and said he was the owner of the Suspect Vehicle. The male apparently was the father of Frank Desideri (169:2-9); however, the sergeant did not follow up and ask about who had been driving the car. He testified, "I didn't see the need to ask him anything at the time; and, again there was a lot going on, and he walked away after that. I had no reason to detain him and demand his name." (172:23-25; 173:2).

29. A cell phone was found on the front passenger seat of the Suspect Vehicle, but none of the officers checked it to determine to whom it belonged. Later, it was determined that the cell phone belonged to Desideri, not to the plaintiff.

30. Audio tapes indicate that an officer from WCPD asked that the registration be run on a white two-door BMW that was parked near the suspect vehicle. A registration search revealed that the BMW was registered to Anthony DeMichael.

31. While the plaintiff was being held in custody in the 45th Precinct Stationhouse, the plaintiff's father, Anthony DeMichele, arrived at the precinct and informed Sergeant Mellusi, the desk officer, that his son did not drive a Mercedes but, instead, drove a BMW that was registered in Anthony DeMichele's name. Despite this information, Sergeant Mellusi failed to inquire further about the information in order to be sure the wrong person had not been arrested. According to his testimony, instead of performing a computer check to verify the father's information, he merely brushed off the information, stating, "If I had a dollar for every time someone came to the precinct and family members or friends said they were innocent, I wouldn't be here right now. I would

be retired in the Bahamas." (217:5-9). He admitted that it would have taken five seconds to confirm that the owner of the Mercedes was not the plaintiff. (218:13-22).

32. Subsequent investigation disclosed that the Suspect Vehicle was owned by Marcie Manfredonia indirectly through a corporation. The corporation also owned the Residence, and her son Frank Desideri drove the Suspect Vehicle. Shortly before the police arrived at the Residence, Desideri had entered the apartment, told Ms. Bonura that the police were after him then hid from the police.

### Robbery Identification

33. Unrelated to the vehicle pursuit, NYPD officers obtained information that the driver of the Suspect Vehicle was the perpetrator of a possible robbery in front of 870 Shore Road in the Bronx at about 10:30 p.m., on Saturday, January 17, 2009. Sergeant Mellusi, the desk officer of the 45th Precinct Stationhouse at the time in question, testified that the complainant of that robbery, Robert Guerrerio, had come into the 45th Precinct to file the complaint. Guerrerio told the Sergeant that the perpetrator of the robbery drove a white Mercedes that matched the description of the Suspect Vehicle. At that time, the Sergeant heard transmissions over the police radio of the chase involving a white Mercedes. He drew a connection between the robbery and the chase, and he sent Guerrerio to the Residence on Edison Avenue "to see if it's the same guy." (Mellusi, 111:20-25; 112:2-4; 120:2-6).

34. Mr. Guerrerio was taken to the scene and a show-up was conducted in which Mr. Guerrerio allegedly identified DeMichele as the perpetrator of the robbery. The show-up took place sometime after 1:00 a.m., on Sunday, January 18, 2009. Guerrerio was shown the Suspect Vehicle at the scene of the plaintiff's arrest, and then he was shown DeMichele who was handcuffed and seated in the back of the police car. DeMichele had blood on his face and was in his underwear. DeMichele was not taken out of the car to stand for the identification. (196:6-8). On the basis of this identification, DeMichele was arrested and charged with:

    Robbery 1st
    Robbery 2nd
    Robbery 3rd
    Grand Larceny 4th
    Petit Larceny
    Resisting Arrest
    Criminal Possession of Stolen Property 5th

35. Several days after the arrest, Detective Fennell, 45th Precinct Detectives, who was assigned to investigate the robbery case, interviewed Guerrerio. During his testimony, Detective Fennell verified that his notes of Guerrerio's statements indicated that "Cop shows perp with flashlight in car, head down, looked like him." (108:12-20). Fennell also testified that Guerrerio did not say that he looked at the suspect's face. (109:67-12). Thereafter, Detective Fennell was contacted by Detective Fumuso, WCPD,

who had been investigating the vehicle accident. Detective Fumuso informed him that a misidentification may have occurred. Detective Fennell arranged a photo-array for Guerrerio to view, and Guerrerio identified the photograph of Desideri as the perpetrator of the robbery. Desideri was subsequently arrested along with Tristano Rivieccio, the person whom the police failed to investigate at the scene of DeMichele's arrest.

36. On March 26, 2009, the criminal charges that NYPD had filed against DeMichele were dismissed on the motion of the Bronx District Attorney as indicated in the Grand Jury Disposition Sheet. The District Attorney was highly critical of the manner in which the identification was conducted, stating, "[T]he identification was a point out in which the defendant was seated in the back of a police car with a hooded sweatshirt on, when it was dark outside and the defendant had blood running down his face. However when Assistant District Attorney Thill was writing up the case, neither the officer nor the complaining witness provided these additional facts."

## OPINIONS

37. My evaluation of the above material regarding this matter and my experience, education, and training leads me to form the opinion within a reasonable degree of professional certainty that the defendants violated proper police practices and procedures in connection with the arrest, investigation, use of force, identification, and charges filed against the plaintiff, Frank De Michele.

I. Defendants' Identification and Arrest Of Plaintiff Violated Proper Police Practices And Procedures

38. In my professional opinion, the arrest of DeMichele was a violation of proper police procedures and practices. Police officers are trained that to make a lawful arrest their decision to do so should be based on facts and circumstances that would lead a reasonable person to conclude that the person to be arrested committed, was committing, or was going to commit a crime. In this case, the officers did not make the proper and standard police procedural efforts to justify the arrest. DeMichele was of the same sex and approximate age of the driver of the suspect vehicle, but the officers clearly jumped to conclusions without any attempt to verify their suspicions that he, in fact, was the driver of the suspect vehicle.

39. The officers failed to follow obvious leads and failed to consider or act upon evidence or potential evidence that would have undermined their assumptions. Ms. Bonura told them that the person they were looking for was in the residence, yet they did not follow up on that information. Officer Serlin confirmed this. As he testified, "She said it was the landlord's kid." (110:21). The facts and circumstances of this case indicated that the actual perpetrator was in the building, yet the police failed to even look for him. In addition, Detective Fumuso reported that Sergeant McGuinness stated that the mother told him the person they were looking for was upstairs, yet the Sergeant neglected to investigate that information. At his deposition, Sergeant McGuinness denied making

9

the statement that the mother told him that. However, no other explanation is evident as to why Detective Fumuso would record such statement in his report.

40. Sergeant McGuinness elaborated, stating, "Absolutely not. If that had happened, we would have went into the house and checked." (236:4-7). In my opinion that is what should have been done, either on the basis of the mother's contested statement to Sergeant McGuinness or her confirmed statement to Officer Serlin. It was imperative that the officers conduct a search of the house for the true suspect before proceeding with an arrest of the plaintiff. Enough personnel were present to do so expeditiously.

### A) Westchester County Department of Public Safety's alleged identification

41. To arrest DeMichele on the grounds that the WCPD bloodhound tracked the scent from the Mercedes to the steps leading to the rear door of 1164 Edison was a violation of proper police procedures and practices as that fact alone could not support the decision to make the arrest. Since Desideri apparently entered the rear door, understandably the dog tracked his scent to the rear steps. However, the dog did not track to or "identify" DeMichele before the police arrested him. The assumption that because the dog tracked to the rear steps it followed that DeMichele was the driver of the Mercedes was not a proper assessment of the dog's actions. Furthermore, if, as the police claim, the dog indicated on DeMichele in the backyard, that indication would have been of very little value since the dog might have reacted to another occasion that DeMichele was in the vehicle, unrelated to this incident. Relying on a dog's indication to support an arrest is not proper police practice or procedure. A dog's indication can be used as an investigative lead, but such indications involve too many variables and uncertainties to establish grounds to arrest.

42. Captain Urprasad, the superior officer that Officer Serlin claimed directed him to conduct a track from the Suspect Vehicle to the rear door of the Residence, testified that he did not remember the dog tracking to the door or identifying the plaintiff. Also, in another inconsistency, Officer Serlin's claim that the dog indicated on the plaintiff was omitted from his initial statement to Detective Fumuso.

43. The manner in which Officer Tierney was allowed to identify DeMichele as the driver of the Suspect Vehicle was also a violation of proper police procedures and practices. The identification by Tierney occurred in overly suggestive circumstances: while DeMichele was being restrained by several police officers.

44. The fact that Officer Tierney was a police officer makes no difference. He was a witness to a crime, and the identification should have been conducted in a careful manner as it should be with any witness. Lieutenant Crespo testified that the WCPD officer was next to him about twenty feet from DeMichele when he made the identification. Allowing the identification from distance of twenty feet of a suspect whom the officer had only seen briefly through a car window at night was a violation of proper police procedures and practices. The identification by Tierney should not have been used

as a basis for probable cause to arrest to DeMichele as it was overly suggestive and thus unreliable.

### B) New York City Police Department's alleged identification

45. The manner in which Mr. Guerrerio was allowed to identify DeMichele as the alleged robber was also a violation of proper police procedures and practices. Even if, hypothetically, an identification of DeMichele in the vehicle matter was warranted, it should have been conducted by means of a controlled and objective lineup, rather than this overly suggestive show-up. Show-ups are inherently suggestive and should be done only out of necessity, and it should never be done under circumstances that are clearly suggestive, as in this case. The police should not conduct a show-up when they have to physically restrain a suspect in the presence of the witness. To do so would be overly suggestive and would likely taint, not only the show-up identification, but also any subsequent identification. Here, the suspect was in the process of being restrained. Furthermore, since the suspect was being restrained by police, this identification could not be deemed a spontaneous point out.

46. Before arresting DeMichele, the officers should have checked the registration and ownership of the Suspect Vehicle. However, they did not. If they had, they would have learned of the connection to the owner of the building and the connection to Desideri. In fact, Sergeant McGuinness testified that a male, apparently the father of Desidiri, approached him and said that he was the owner of the Suspect Vehicle, yet the Sergeant failed to follow up on that important information. Confirming this information would have greatly undermined the notion that DeMichele was the driver of the Suspect Vehicle. The police arrested DeMichele without understanding the basic facts about the ownership of the car and the relationship of DeMichele and Desideri, which they might have obtained from Desideri's father or from Rivieccio. Moreover, further investigation would have disclosed that DeMichele did not own a Mercedes but drove a BMW, which was parked outside and was registered to his father. In my opinion the police violated proper police procedures by failing to interview these two witnesses and by ignoring the information provided by Anthony DeMichele and Margaret Bonura.

47. In addition, the cell phone recovered from the Suspect Vehicle should have been checked to determine the owner, but a check was not done. Doing so would have alerted the police that the cell phone in the vehicle from which the suspect had fled belonged to Desideri, not the plaintiff. This information would also have greatly undermined the notion that DeMichele was the person who had fled in the Suspect Vehicle.

48. The only basis for connecting DeMichele to the robbery charge was the mistaken assumption that he was driving the Mercedes that had been used in the robbery. The police failure to properly investigate who was driving the Suspect Vehicle and their unsupportable conclusion that DeMichele was the driver, rather than Desideri, propelled them to engage in further violations of proper police procedures and practices, e.g.,

11

conducting improper identification procedures, and erroneously charging him in Bronx Criminal Court.

49. The manner in which Guerrerio, the robbery victim, was allowed to identify DeMichele as the perpetrator of the robbery that had occurred at least two-and-one-half hours earlier at a location approximately 5.4 miles from the identification scene was a violation a proper police procedures and practices. A lineup or a photo-array should have been conducted; instead, a show-up was conducted. Show-ups are allowed when the police apprehend a suspect shortly after and in the vicinity of a crime. In such cases, they police may conduct a "show-up" in which they promptly bring the suspect to a witness or a witness to the suspect for a one-on-one identification. However, this procedure is inherently suggestive and should be done only out of necessity. It should not be done when the crime was committed hours earlier and at a distant location, as in this case, and it should never be done under circumstances that are clearly suggestive, as in this case. The identification by Guerrerio occurred in overly suggestive circumstances. Guerrerio saw the white Mercedes at the show-up scene and was positive it was the car used during the robbery. He was aware that the police had been chasing a white Mercedes, and those facts would clearly suggest that the suspect had been apprehended in the car. In addition, the suspect was handcuffed and seated in the back of a police car. He had blood on his face and was wearing only underwear. He was not taken out of the car to stand for the identification so that the witness could see him entirely. A flashlight was shined on his face, which is suggestive and distorts a person's appearance.

50. The show-up with the witness Guerrerio violated the provisions of NYPD Patrol Guide, Section 208-24, Identification Lineups/Show-ups, which states that a show-up may be conducted when:

> A. Seizure of a suspect is effected within a reasonable time after the commission of the crime (usually one hour is considered reasonable, but the facts of the case may permit increasing the time period AND,
>
> B. Seizure of a suspect is effected within an area reasonably near the crime scene (Consider distance that could reasonably be covered within time period given and under circumstances present) AND,
>
> C. Suspect is shown to a witness in a fair and reasonable manner which is not unnecessarily suggestive.

51. Sergeant Mellusi's explanation regarding his decision to send Guerrerio to the scene where the show-up was conducted was that "It's just what we do. I don't know why. This is something—we always bring the complainant to the perpetrator. We don't bring the perpetrator to the complainant." (Mellusi, 121:15-18). In my opinion, his explanation indicates a lack of understanding by the officer and a lack of training by the NYPD as per the legal and Patrol Guide requirements pertaining to show-ups and lineups. Also, the superior officers on the scene who allowed the show-up to be conducted under these circumstances failed to exercise proper supervision and this failure violated proper police practices and procedures. Even if there had been grounds to conduct an identification of DeMichele in the robbery matter, it should have been conducted by

12

means of a controlled and objective lineup or photo-array, rather than this overly suggestive show-up.

52. Sergeant Mellusi's failure to make the slightest effort to follow up on possible exculpatory information offered to him by the plaintiff's father regarding the ownership of the vehicle demonstrates a lack of understanding of police duties. (216-218). It also demonstrates a failure of NYPD to train and supervise their officers regarding their responsibilities to safeguard against wrongful arrests.

53. Nevertheless, DeMichele was arrested and charged in the Bronx with three counts of robbery, grand larceny, resisting arrest, and other crimes. In my opinion, proceeding with the charges against the plaintiff and subjecting him to detention on the basis of the improperly conducted identification and while ignoring exculpatory information from witnesses violated proper police practices and procedures.

54. The attempt by the police or the district attorney to categorize the identification procedure a "point-out" was erroneous. A point-out is when a witness sees a suspect who is not in police custody, for example, walking down the street, and the witness spontaneously identifies the suspect. Bringing a complaining witness to the location of a suspect who is in police custody, such as while seated in the back of a police car, is a show-up.

## II. The Type And Level Of Force Used By Defendants Violated Proper Police Practices And Procedures

55. Regarding the injuries sustained by DeMichele, if they resulted from the police punching him, slamming his head against a wall, throwing or tripping him to the ground while he was handcuffed, as alleged by the plaintiff and witnesses, those actions would be clear violations of proper police procedures and practices. Police may use only reasonable and necessary force to make an arrest. Lieutenant Crespo testified that DeMichele had been handcuffed prior to ascending the stairs, and once he was handcuffed, it would have been unreasonable and unnecessary to have struck him or to have thrown him to the ground. Furthermore, even if DeMichele was not yet handcuffed when he was at the top of the steps, enough police officers were present to hold and restrain him without having to strike him or slam his head into the wall. Moreover, even if, as some officers claimed, DeMichele was slamming or scraping his own head against the wall, the police had a duty to restrain him and prevent injury.

56. If the injuries in fact resulted from DeMichele falling to the ground while he was handcuffed and while he was being taken from the apartment to the police car, such an occurrence would be a violation of proper police procedures and practices. Once a suspect is handcuffed and in custody, the police have a duty to ensure his safety. Making him walk, without shoes or socks, across icy ground on a January night without keeping him from falling was a violation of the duty to ensure his safety, and under these circumstances a violation of proper police procedures and practices. Moreover, taking him from the apartment without allowing him to have some clothes or shoes served no

13

legitimate police purpose. Enough officers were present to guard DeMichele in order to obtain clothes and shoes for him.

57. Twisting the handcuffs for so-called "cuff control," as described by Officer Ruiz, was an egregious violation of proper police procedures and practices. Handcuffs are used to prevent prisoners from engaging in dangerous conduct; they are not meant to inflict pain. Furthermore, it was in violation of WCPD General Order 1.01: Use of Physical Force, which states as follows:

> The handcuffs shall be secured upon the wrist and adjusted so as to prevent the prisoner from slipping out, but not so tight as to cause discomfort or injury.

III. Defendants' Prosecution of Plaintiff Violated Proper Police Practices and Procedures

58. In my professional opinion, the mistaken belief by the police that the plaintiff had assaulted Officer Tierney with his vehicle and then led the police on a dangerous high-speed chase through Westchester County and into the Bronx caused the police to act with malice toward the plaintiff and, thereby, to disregard proper police practices and procedures in the arrest, treatment, and prosecution of the plaintiff, as noted above in this report. Although the initial arrest of the plaintiff involved the vehicle assault and high-speed chase in Westchester County, the police improperly conducted an investigation into an unrelated crime that occurred in the Bronx and improperly prosecuted the plaintiff for that crime, which involved the serious charge of robbery 1st degree, a class B felony.

IV. Defendants' Failure To Adequately Train And Supervise Their Officers Violated Proper Police Practices and Procedure

54. Officer Ruiz's testimony that he believed that "cuff control" was an authorized police practice indicates a failure of WCPD to adequately train and supervise its officers. The WCPD supervisor on the scene, Sergeant McGuinness described "cuff control" as "what you would use to gain compliance from a handcuffed prisoner that's being otherwise noncompliant." He also believed that cuff control was an authorized police practice (290:16-25), further indicating the failure of WCPD to adequately train and supervise its officers.

55. Officer Brady's testimony that he had not been trained in the use of the helicopter camera indicates a failure of WCPD to adequate train its officers. Additionally, the failure to train Officer Brady in the use of the helicopter camera created an omission of evidence in this case.

56. Under these circumstances, the use of show-ups instead of lineups for the vehicle pursuit and the robbery identifications indicates a failure of the NYPD to properly train and supervise its officers. In addition, the fact that Captain Urprasad, a high-level NYPD officer, during his testimony, could not recall any details about the identification

procedures indicates a lack of supervision during this critical procedure. As a managerial level officer, he should have ensured that proper practices and procedures were followed.

57. Furthermore, the improper arrests, use of force, and treatment of the plaintiff indicate a failure of both the WCPD and the NYPD to adequately supervise and train their personnel. In this case, high ranking members of the NYPD were present and failed to appropriately supervise the actions of their subordinate police officers. Not only did these supervisors participate in the improper police procedures, but they observed others, including their subordinates committing improper acts of misconduct, and did nothing to intercede, stop, or mitigate those acts.

## CONCLUSION

58. In my opinion, the actions of both the NYPD and the WCPD officers violated proper police practices and procedures for the reasons stated above, particularly, the improperly conducted identifications of the plaintiff, the failure to consider the exculpatory evidence from witnesses and databases that were readily available, the failure to search for the true suspect, the use of improper force against the plaintiff, including the improper use of handcuffs, and the mistreatment of the plaintiff while he was in police custody. Furthermore, proceeding against the plaintiff with robbery and other charges on the basis of an improper identification procedure and in the face of the overwhelming evidence readily available that contradicted his involvement violated proper police practices and procedures. In addition, the police conduct in this case clearly indicates a failure by both WCPD and NYPD to properly supervise, train, and discipline their officers.

_Walter Signorelli_

WALTER SIGNORELLI, ESQ.　　　　　　　　July 2011  
1992 Commerce Street  
Yorktown Height, New York 10598  
914 245 5904  

Expert Witness Testimony Regarding Police Procedures

| | | |
|---|---|---|
| 2/16/07 | Portela v. NYC | NYS Supreme Court, NYC<br>Judge Schlesinger,<br>#101805/03<br>Weiser & Associates<br>Trial testimony |
| 3/19/07 | Vera v. New York State | NYS Court of Claims<br>Judge Marin<br>Fred Lichtmacher<br>Trial Testimony |
| 2/28/08 | Jordan v. Suffolk County | Suffolk County Sup. Court<br>24626/04, J.Rebelino<br>A. Feruru |
| 2/12/09 | Caceres v. Port Authority | U.S. Southern District<br>Judge Koeltl<br>Leventhal & Klein<br>Trial testimony |
| 11/4/09 | Rodriguez v. Salvation Army | NYS Supreme Court, Bronx<br>J. Edgar Walker<br>Rissoff<br>Trial testimony |
| 3/19/10 | Daniels v. Chicago | U.S. Dist., Northern Illinois<br>Loevy & Loevy<br>Deposition testimony |
| 3/30/11 | Perriello v. NYS | NYS Court of Claims<br>Judge Mignano<br>Bleakley, Platt<br>Trial testimony |

# WALTER SIGNORELLI, ESQ.
1992 Commerce Street
Yorktown Heights, N.Y. 10598
(914) 245 5904
E-mail: Walter2497@Aol.com

**PERSONAL**     Attorney, NYS Bar, 1984
Lecturer in Law and Police Science
Retired NYC Police Department Inspector
Consultant re: police procedures

**EDUCATION**    St. John's University School of Law
Juris Doctorate, Cum Laude, 1983
Awards: Criminal Law & Criminal Procedure

Columbia University School of Management
Police Management Institute, 1992

John Jay College of Criminal Justice, 1977

**PROFESSIONAL QUALIFICATIONS**

**Management and Administration**     Inspector, Deputy Inspector, Captain, NYC Police Department. Commanding Officer of precincts, divisions, districts.

**Investigations**     Supervised investigative units in Detective Bureau, Organized Control Bureau, and Narcotics Division.

**Professional**     Admitted to practice law, New York State Bar Association, 1984

**Teaching**     Courses taught: Constitutional Law, Criminal Law, Evidence, Criminal Procedure Law, Criminal Investigations, Police Administration, Organized Crime

**PUBLICATIONS**     *Constable Has Blundered: Exclusionary Rule, Crime, and Corruption:* Carolina Academic Press, 2010

*Crisis of Police Liability Lawsuits:*
*Prevention and Management*
Carolina Academic Press, 2006

Contributor: *Preparation Guide: State Trooper Exam*
Learning Express, N.Y., 2007

## EMPLOYMENT EXPERIENCE

| | |
|---|---|
| Jan. 1998 to Present | John Jay College of Criminal Justice<br>Lecturer and Adjunct Professor |
| March 2001 to Present | Attorney<br>Westchester County Defense Panel |
| 2000 to Present | Independent Consultant re: police procedures |
| 2004 to 2006 | St. John's University<br>Adjunct Professor |
| 1998 to 2004 | Worldlink Investigative Services, Inc.,<br>President |

1967 to 1998      New York City Police Department

| Rank | Dates | Assignments: |
|---|---|---|
| Inspector | 1997-98 | Detective Borough Brooklyn South |
| Inspector | 1996-97 | Narcotics Division, Man. North Initiative |
| Inspector | 1994-96 | Narcotics Division, Executive Officer |
| Inspector | 1991-94 | License Division, Commanding Officer |
| Dep.Inspector | 1990-91 | Chief of Patrol's Office, Community Policing |
| Dep.Inspector | 1989-90 | Narcotics Division, Bronx, Acting CO |
| Dep.Inspector | 1987-89 | 24th Precinct, Commanding Officer |
| Captain | 1985-87 | Personnel Bureau, Employee Management, Staff Services |
| Captain | 1983-85 | 79th Precinct, Commanding Officer |
| Captain | 1980-83 | Organized Crime Control Bureau,<br>Manhattan No. Public Morals Division, Commanding Off. |
| Captain | 1979-80 | 46th Precinct, Executive Officer |
| Lieutenant | 1977-79 | 50th Precinct, Desk Officer |
| Sergeant | 1974-77 | 70th Precinct, CO, Anti-Crime |
| Sergeant | 1973-74 | 88th Precinct, Patrol Supervisor |
| Sergeant | 1972-73 | 17th Precinct, Patrol Supervisor |
| Police Officer | 1968-72 | 80th Precinct |
| Police Officer | 1967 | Police Academy |

**PROFESSIONAL SOCIETIES**

New York State Defenders Association
Westchester County Bar Association
Columbia University, Police Management Institute
American Academy of Professional Law Enforcement
New York State Association of Criminal Defense Attorneys
Academy of Criminal Justice Sciences
New York State Bar Association

WALTER SIGNORELLI, ESQ.  July 2011
1992 Commerce Street
Yorktown Height, New York 10598
914 245 5904

Expert Witness Testimony Regarding Police Procedures

| Date | Case | Court / Details |
|---|---|---|
| 2/16/07 | Portela v. NYC | NYS Supreme Court, NYC<br>Judge Schlesinger,<br>#101805/03<br>Weiser & Associates<br>Trial testimony |
| 3/19/07 | Vera v. New York State | NYS Court of Claims<br>Judge Marin<br>Fred Lichtmacher<br>Trial Testimony |
| 2/28/08 | Jordan v. Suffolk County | Suffolk County Sup. Court<br>24626/04, J.Rebelino<br>A. Feruru |
| 2/12/09 | Caceres v. Port Authority | U.S. Southern District<br>Judge Koeltl<br>Leventhal & Klein<br>Trial testimony |
| 11/4/09 | Rodriguez v. Salvation Army | NYS Supreme Court, Bronx<br>J. Edgar Walker<br>Rissoff<br>Trial testimony |
| 3/19/10 | Daniels v. Chicago | U.S. Dist., Northern Illinois<br>Loevy & Loevy<br>Deposition testimony |
| 3/30/11 | Perriello v. NYS | NYS Court of Claims<br>Judge Mignano<br>Bleakley, Platt<br>Trial testimony |