UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FRANK DE MICHELE,

                Plaintiff,

      v.

CITY OF NEW YORK, COUNTY OF
WESTCHESTER, TIMOTHY BUGGE,
DEODAT URPRASAD, ADAM MELLUSI,
ROGER DICARLO, ANDREW MYBERG,
WILLIAM T. MCGUINNESS, BRIAN P.
TIERNEY, GEORGE O. RUIZ, CHRISTIAN M
GUTIERREZ, MITCHELL B. SERLIN,
CHRISTOPHER M. LIEBERMAN, MICHAEL
N. BRADY, RICHARD E. PUCILLO, AND
DOES 1-20,

                Defendants.

**ECF CASE**

**MEMORANDUM
OPINION &ORDER**

09 Civ. 9334 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiff Frank DeMichele brings this action pursuant to 42 U.S.C. § 1983 and

state law against Defendants City of New York (the "City"), New York City Police Department

("NYPD") Deputy Inspector Timothy Bugge, NYPD Captain Deodate Urprasad, NYPD

Sergeant Adam Mellusi, NYPD Officers Roger DiCarlo and Andrew Nyberg[1] ("the City

Defendants"), the County of Westchester (the "County"),Westchester County Sergeant William

McGuinness, and Westchester County Police Officers Brian Tierney, George Ruiz, Christian

Gutierrez, Mitchell Serlin, Christopher Lieberman, Michael Brady, and Richard Pucillo

(together, "County Defendants"), asserting claims related to his January 18, 2009 arrest.  The

Amended Complaint includes (1) causes of action for excessive force, false arrest, malicious

prosecution, and deprivation of access to the courts under Section 1983; (2) Monell claims

---

[1] Nyberg is incorrectly named in the caption as Myberg.

against the County and the City; and (3) state law causes of action for false arrest, malicious

prosecution, battery, and assault.  (Am. Cmplt.)

Plaintiff has moved for summary judgment on his claims against (1) Defendants

Urprasad, Mellusi, and DiCarlo for false arrest and malicious prosecution under Section 1983

and state law; and (2) Defendant Ruiz for excessive force under Section 1983.  (Dkt. No. 77)

The City Defendants have moved for summary judgment on Plaintiff's (1) false

arrest claims, because his arrest was supported by probable cause; (2) malicious prosecution

claims, because the prosecution was instituted with probable cause; (3) claims against the

individual City defendants, on qualified immunity grounds; (4) claims against defendants Bugge

and Mellusi, because of a lack of evidence that they were personally involved; and (5) claims

against the City, arguing that he has not established a basis for Monell liability.  (Dkt. No. 72)

The County Defendants have moved for summary judgment on Plaintiff's

excessive force, false arrest, assault, and battery claims, and claim for punitive damages.  (Dkt.

No. 80)

For the reasons stated below, the City Defendants' and County Defendants'

motions will be granted in part and denied in part, and Plaintiff's motion will be denied.[2]

## BACKGROUND

Plaintiff's claims arise out of his arrest in the early morning hours of Sunday,

January 18, 2009.  County police arrested Plaintiff for drag racing on the Hutchinson River

---

[2]  Plaintiff consents to the dismissal of (1) his claims against Officer Nyberg (Pltf. Opp. City Br.
at 24); his Section 1983 claim for denial of access to the courts as against Officers Lieberman,
Brady, and Pucillo (Pltf. Opp. County Br. at 24-25); and his state law assault and battery claims
against Officer Serlin.  (Id.)  Accordingly, these claims will be dismissed.

Parkway, while NYPD officers arrested him for armed robbery.  (County R. 56.1 Stmt. ¶¶ 64-69)[3]

## I.   <u>COUNTY POLICE CAR CHASE</u>

At about 12:35 a.m on January 18, 2009, County Officer Christian Gutierrez observed a white Mercedes Benz C63 racing with a gray Audi on the lower Hutchinson River Parkway.  (County R. 56.1 Stmt. ¶¶ 63-64)  Officer Gutierrez attempted to stop the two cars, but they accelerated and began to recklessly weave in and out of traffic at high speed.  (County R. 56.1 Stmt. ¶ 65; Pltf. R. 56.1 Stmt. ¶ A)

Gutierrez contacted a County helicopter unit, which then began tracking the two vehicles on the Parkway.  (County R. 56.1 Stmt. ¶ 66; Jones Decl., Ex. H (Lieberman Dep.) at 29-30; Pltf. R. 56.1 Stmt. ¶ B)  The helicopter was staffed by County Officer Christopher Lieberman, the pilot, by County Officer Richard Pucillo, a tactical flight officer; and by County Officer Michael Brady, a tactical flight officer in training.  (County R. 56.1 Stmt. ¶ 66)  Officer Lieberman observed the white Mercedes traveling at a high rate of speed southbound on the Parkway, and followed it to a point where it stopped in traffic on the highway shoulder.  (County R. 56.1 Stmt. ¶ 67)

Officer Lieberman observed a County police car – driven by County Officer Brian Tierney – attempt to intercept the vehicle.  (County R. 56.1 Stmt. ¶ 68)  Tierney drove his patrol car onto the shoulder and positioned it immediately in front of the white Mercedes; the front bumpers of the two vehicles were facing each other, approximately three feet apart.  (County R.56.1 Stmt. ¶ 79; PX 13 (Tierney Dep.) at 17)  Tierney had his vehicle's headlights and police

---

[3]  To the extent that this Court relies on facts drawn from the parties' Local Rule 56.1 statements, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence.  <u>See</u> <u>Giannullo v. City of New York</u>, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted).

lights on, and was able to observe that the white Mercedes's sole occupant was a white man with short brown hair, between the ages of 18 and 22, wearing a Yankees baseball cap.  (County R.56.1 Stmt. ¶ 80; Jones Decl., Ex. E (Tierney Dep.) at 20-22)  The driver of the white Mercedes put the car into reverse, and then smashed into the front passenger side of Tierney's car.  (County R.56.1 Stmt. ¶ 81; Jones Decl., Ex. E (Tierney Dep.) at 23)  The bumper of Tierney's car was damaged (id.), and he lost sight of the white Mercedes.  (County R.56.1 Stmt. ¶ 82)

Officer Lieberman observed the white Mercedes drive at a high rate of speed to 1164 Edison Avenue in the Bronx, where the car's single occupant fled into that building.  (County R. 56.1 Stmt. ¶ 69; Pltf. R. 56.1 Stmt. ¶ I)  Lieberman transmitted the location of the white Mercedes over the radio, and Officer Tierney and other County police officers responded to that location.  (County R. 56.1 Stmt. ¶¶ 70, 82)  At 1164 Edison Avenue, Tierney observed NYPD officers and other County officers (County R.56.1 Stmt. ¶ 83), including County Officers Serlin, Gutierrez, and Ruiz.  (County R.56.1 Stmt. ¶ 84)  The County helicopter was positioned above the house, with its spotlight trained on the ground.  (County R.56.1 Stmt. ¶ 84)

Officer Tierney observed three NYPD officers, including a captain, at the entrance to the basement apartment of the building.  (County R.56.1 Stmt. ¶ 85)  County Officer Serlin brought a police dog to the scene and had the dog sniff inside the white Mercedes.  Officer Serlin then directed the dog to track the scent.  (County R.56.1 Stmt. ¶ 56; PX 16 (Serlin Dep.) at 12-15)  The dog tracked the scent to the steps leading down to Plaintiff's basement apartment.  (Id.)  NYPD officers then knocked on the door to that apartment.  (PX 16 (Serlin Dep.) at 16)

Tierney was subsequently asked to view a suspect.  From about 10 to 15 feet away, Tierney identified DeMichele as the individual who had been driving the white Mercedes.  (County R.56.1 Stmt. ¶¶ 86-87; PX 13 (Tierney Dep.) at 61-63)

## II.   <u>NYPD ARMED ROBBERY ARREST</u>

At some point before January 17, 2009, Robert Guerrerio, Jr. arranged to sell Mercedes car parts to an individual over the Internet.  (City R.56.1 Stmt. ¶ 104)  Late in the evening on January 17, 2009, Guerrerio went to a golf course on Shore Road in the Bronx, where he had agreed to sell the car parts.  (City R.56.1 Stmt. ¶ 105)  At that location, Guerrerio observed two men emerge from a customized, white Mercedes C63 automobile with a black roof.  (City R. 56.1 Stmt. ¶ 106; Nyugen Decl., Ex. B (Guerrerio Aff.) ¶ 5)  One man threatened to shoot Guerrerio, and both robbed him of his car parts and cellular telephone.  (City R. 56.1 Stmt. ¶ 106; Nyugen Decl., Ex. B (Guerrerio Aff.) ¶ 5)  Guerrerio attempted to report the robbery to New Rochelle police, but was instructed to report the crime to officers at the 45th Precinct in the Bronx.  (City R. 56.1 Stmt. ¶ 109; Nyugen Decl., Ex. B (Guerrerio Aff.) ¶¶ 7-8)  Guerrerio arrived at the 45th Precinct about one hour after the robbery.  (City R. 56.1 Stmt. ¶ 110; Nyugen Decl., Ex. B (Guerrerio Aff.) ¶ 9; Pltf. R. 56.1 Stmt. ¶ FFF)

While at the 45th Precinct, Guerrerio overheard a report about a high speed car chase involving a white Mercedes C63 with a black roof.  (City R. 56.1 Stmt. ¶ 111)  An NYPD officer brought Guerrerio to 1164 Edison Avenue in the Bronx, where the car had stopped.  Plaintiff resides in a basement apartment at this location.  (City R. 56.1 Stmt. ¶ 111; Pltf. R. 56.1 Stmt. ¶¶ III, KKK; <u>see also</u> PX 26 (Ferrer Dep) at 16-17; County R. 56.1. Stmt. ¶ 1)

Guerrerio arrived at 1164 Edison Avenue two to three hours after the robbery.  (City R. 56.1 Stmt. ¶ 112)  At that location, Guerrerio observed a white Mercedes C63 and Plaintiff sitting in the back of a County police car.  Guerrerio told police that the car appeared identical to the one used by the men who had robbed him, and noted that the car was unique, because it had been customized.  (City R. 56.1. Stmt. ¶¶ 112-13)  Guerrerio also told police that

5

Plaintiff "look[ed] like" one of them men who had robbed him.  (City R. 56.1 Stmt. ¶ 114)

When Guerrerio made his identification, Plaintiff had blood on his face, and was wearing only

underwear and a tank top.  (Pltf. R. 56.1 Stmt. ¶ PPP)  NYPD Defendants Urprasad and

McGuinness were present at the showup identification. (Pltf. R. 56.1. Stmt. ¶ VVV; PX 32

(McGuinness Dep.) at 112)

### III.    PLAINTIFF'S BACKGROUND AND ACTIVITIES ON JANUARY 17-18, 2009

The building at 1164 Edison Avenue is owned by Marcy Manfredonia (County R.

56.1. Stmt. ¶ 2) and contains four apartments.  (Id. ¶ 12)  Manfredonia and her family, including

her son – Frank Desideri – live in a basement apartment in the building.  (Id. ¶ 4)  Plaintiff and

his mother, Margaret Bonura, reside in another basement apartment in the building.  (Id. ¶ 1)

Plaintiff's apartment has two entrances:  a front door on Edison Avenue, and a rear door that

opens onto B Street.  (Id. ¶ 14)  Only Plaintiff's apartment is accessible through the rear of the

building.  (Id. ¶ 16)

Plaintiff was 19 years old at the time of his arrest, and was "good friends" with

Desideri (id. ¶ 6; PX 7 (DeMichele Dep.) at 55; Pltf. Resp. to County R. 56.1 Stmt. ¶ 6), seeing

him two to three times per week.  (Id.; PX 7 (DeMichele Dep.) at 56)  Plaintiff's girlfriend,

Diana Brescia, and Desideri's girlfriend, Christina Ruocco, were also friends.  (Id. ¶ 11)

Plaintiff drove a 2008 white BMW.  (Id. at ¶ 8)  Desideri drove a white Mercedes

that was registered to Nationwide Maintenance General Contracting, a company owned by his

mother.  (Id. ¶ 9)  Plaintiff did not drive the white Mercedes on January 17-18, 2009.  (Id. ¶ 10;

Jones Decl., Ex. A (DeMichele Dep.) at 57-58)

During the afternoon of Saturday, January 17, 2009, Plaintiff and his girlfriend,

and Desideri and his girlfriend, visited with Tristano Reveccio, at Reveccio's home.  (Id. ¶ 25)

In the evening, the group left Reveccio's house in separate cars, and drove to the Crosstown

Diner.  (Id. ¶¶ 28-30)[4]  Plaintiff and Brescia drove in Plaintiff's white BMW from the diner to

Plaintiff's residence, where Plaintiff parked his car on B Street.  (Id. ¶ 34)  Plaintiff and Brescia

then went to Plaintiff's bedroom to watch television.  (Id. ¶ 36)

       Shortly thereafter, Desideri entered Plaintiff's apartment through the B Street rear

entrance.  (Id. ¶ 38)  Plaintiff was aware that Desideri had entered the apartment.  (Id. ¶ 47)

## IV.   PLAINTIFF'S ARREST

       Minutes after Desideri entered the apartment, Plaintiff heard a loud knock on the

rear door.  (Id. ¶¶ 41-42; Pltf. R. 56.1 Stmt. ¶ X)  Plaintiff's mother answered the door and spoke

with police officers.  (Id. ¶ 42)  County Officer Tierney identified Plaintiff as the man he had

encountered earlier that evening driving the white Mercedes.  (Id. ¶¶ 46, 87; Jones Decl., Ex. E

(Tierney Dep.) at 61-63; PX 7 (DeMichele Dep.) at 98)  NYPD Captain Urprasad, along with

County Officers Gutierrez and Ruiz, removed Plaintiff from his home.  (Pltf. R. 56.1 Stmt. ¶¶

BB-DD)

       Outside, in Plaintiff's backyard, County and NYPD officers attempted to handcuff

him.  (County R. 56.1 Stmt. ¶¶ 51, 90; Pltf. R. 56.1 Stmt. ¶ HH)  While against a brick wall,

Plaintiff turned his head from side to side.  (Id. ¶¶ 52, 90; Jones Decl., Ex E (Tierney Dep.) at

73)  The parties dispute to what extent Plaintiff resisted arrest:  Officer Ruiz testified that

Plaintiff was flailing his arms and attempting to kick him and Gutierrez (PX 11 (Ruiz Dep.) at

84-89), but Plaintiff denies that he used force to resist.  (PX 7 (DeMichele Dep.) at 143-44)  The

parties likewise dispute what, if any, force was used against Plaintiff.  Officers Tierney and Ruiz

testified that they used "soft hand" techniques to force Plaintiff's hands behind his back.

(County R.56.1 Stmt. ¶¶ 90, 91)  Ruiz also stated that he used "cuff control" – which involves

---

[4]  Brescia testified that, while at the diner, Desideri told the group about how, earlier that
evening, he and Reveccio had robbed a person named Rob, taking a car part from him.  (Id. at
¶ 32; Jones Decl., Ex. C (Brescia Dep.) at 28, 128-29)  Plaintiff does not recall this conversation.
(PX 7 (DeMichele Dep) at 75)

twisting handcuffs at a pressure point on the wrists – in response to Plaintiff's resistance.  (Pltf. R. 56.1 Stmt. ¶ OO; PX 11 (Ruiz Dep.) at 84-89)  Plaintiff sustained bruises on his wrist, a scrape on his knee, a scrape and bruises on the back of his neck, and a cut above his left eyebrow.[5]  (County R.56.1 Stmt. ¶ 92)  There were about 20 to 25 officers at the Plaintiff's residence at the time of his arrest.  (Pltf. R. 56.1 Stmt. ¶ FF)

## V.   POST-ARREST EVENTS

DeMichele was charged in a criminal complaint with robbery in the first, second and third degree, with grand and petit larceny, with resisting arrest, and with criminal possession of stolen property.  (PX 36 (Criminal Complaint))  He was held in NYPD custody from January 18, 2009 until January 20, 2009, when he was arraigned and released on his own recognizance.  (Pltf. R. 56.1 Stmt. ¶¶ TTTT, VVVV)  He was ordered to return to Bronx County Supreme Court on March 26, 2009.  (Pltf. R. 56.1 Stmt. ¶ WWWW)

Plaintiff's mother filed a civilian complaint with the County.  Her complaint was investigated by County Detective Steven Fumuso.  (County R.56.1 Stmt. ¶ 93; Jones Decl., Ex. M (Fumuso Aff. ¶ 4))  Fumuso's investigation revealed that 1164 Edison Avenue was owned by Marcy Manfredonia, Desideri's mother (id. ¶ 95), and that the white Mercedes observed at the rear of the building on January 18, 2009, and impounded by County police, was also owned by Manfredonia.  (Id. ¶ 94)  Fumuso's investigation also revealed that Christina Ruocco, Desideri's girlfriend, had falsely reported to the New Rochelle Police Department on January 18, 2009, that the Mercedes had been stolen.  (Id. ¶ 103; Jones Decl., Ex. M (Fumuso Aff.) ¶ 6)

---

[5]  Plaintiff claims that he suffered "serious and permanent injuries" to his shoulder, wrist and spine.  (Pltf. Resp. to County R. 56.1 Stmt. ¶ 168)  He underwent surgery in July 2010 to repair damage to his left shoulder.  Plaintiff's physician has opined that his shoulder injury, and other injuries to his neck, back, and wrist, resulted from the January 18, 2009 incident, and that the defendant will continue to suffer a "permanent loss of movement, permanent weakness, and permanent recurrent pain."  (Id., Appx., Ex. 5)

On January 20, 2008, Det. Fumuso interviewed Guerrerio, who reported that "he was 'not 100% sure' about the identification of DeMichele." Guerrerio, however, "had seen the suspect vehicle at the scene on Edison Avenue, and was positive that it was the sa[me] one that 'Frankie Dez' arrived in earlier at 870 Shore Road." (Pltf. R. 56.1. Stmt. ¶ QQQ; PX 1 (Fumuso Report) at 12)

Based on his investigation, Det. Fumuso determined that it was Desideri, and not DeMichele, who had been driving the white Mercedes on January 18, and the County did not bring any charges against Plaintiff. (County R.56.1 Stmt. ¶ 97; Jones Decl., Ex. M (Fumuso Aff.) ¶¶ 6, 9))

In late January 2009, Det. Fumuso told NYPD Detective John Fennell that Plaintiff may have been misidentified on January 18, 2009. (City R. 56.1 Stmt. ¶ 116) In order to confirm the misidentification, Det. Fennell arranged for Guerrerio to view a photo array on February 2, 2009. (City R. 56.1 Stmt. ¶ 117) At that time, Det. Fennell confirmed that Guerrerio had misidentified Plaintiff as one of the robbers on January 18, 2009. (City R. 56.1 Stmt. ¶ 117)

When Plaintiff returned to Bronx County Supreme Court on March 26, 2009, the People dismissed the charges against him. (Pltf. R. 56.1 Stmt. ¶ CCCCC; PX 39) In dismissing the charges, the assistant district attorney noted that "there had been a mis-identification. The first individual who was identified, Mr. DeMichele, had not actually been present during the incident." (Pltf. R. 56.1 Stmt. ¶¶ EEEEE, FFFFF; PX 39)

## DISCUSSION

A number of Plaintiff's claims are brought under Section 1983, which provides "'a method for vindicating federal rights elsewhere conferred,' including under the Constitution." Cornejo v. Bell, 592 F.3d 121, 127 (2d Cir. 2010) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)). In order to state a claim for relief under Section 1983, "[t]he

9

conduct at issue 'must have been committed by a person acting under color of state law' and 'must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.'" Id. (quoting Pitchell v. Callan, 13 F.3d 545, 547 (2d Cir. 1994)).

## I.      SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008).  "'[W]here the nonmoving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim.'" Lesavoy v. Lane, No. 02 Civ. 10162, 2008 WL 2704393, at *7 (S.D.N.Y. July 10, 2008) (quoting Bay v. Times Mirror Magazines, Inc., 936 F.2d 112, 116 (2d Cir. 1991)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'"  Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)).  However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . .  [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'"  Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alterations in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

## II.  FALSE ARREST

Plaintiff has moved for summary judgment on his false arrest claims against

Urprasad, Mellusi, and DiCarlo, while the City and County Defendants have moved for summary

judgment on all of Plaintiff's false arrest claims.

"To establish a claim for false arrest under 42 U.S.C. § 1983, a plaintiff must

show that 'the defendant intentionally confined him without his consent and without

justification.'"  Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004) (quoting Weyant v. Okst, 101

F.3d 845, 852 (2d Cir. 1996)); see also Golphin v. City of New York, 09 Civ. 1015(BSJ), 2011

WL 4375679, at *1 (S.D.N.Y. Sept. 19, 2011) ("In order to state a claim for false arrest [under

New York law], a plaintiff must prove four elements:  (1) the defendant intended to confine the

plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to

the confinement, and (4) the confinement was not otherwise privileged.") (citing Savino v. City

of New York, 331 F.3d 63, 75 (2d Cir. 2003)).[6]  "The Fourth Amendment protects against

unreasonable searches and seizures, including false arrests, by requiring probable cause to

support the execution of any search or seizure."  Golphin, 2011 WL 4374679, at *1 (citing

Jaegly v. Couch, 439 F.3d 149, 151 (2d Cir. 2006)).

### A.  Probable Cause

#### 1.  Applicable Standard

"Because probable cause to arrest constitutes justification, there can be no claim

for false arrest where the arresting officer had probable cause to arrest the plaintiff."  Escalera,

361 F.3d at 743 (citing Weyant, 101 F.3d at 852).  See also Drummond v. Castro, 522 F. Supp.

2d 667, 677 (S.D.N.Y. 2007) ("Regardless of whether the first three prongs are satisfied, the

claim for false arrest will fail where defendants establish that probable cause existed, as the

---

[6] "[L]iability for false arrest [under New York law] also gives rise to liability under 42 U.S.C. §
1983." Savino, 331 F.3d at 75.

existence of probable cause is a complete defense to an action for false arrest.").  "In general,

probable cause to arrest exists when the officers have knowledge or reasonably trustworthy

information of facts and circumstances that are sufficient to warrant a person of reasonable

caution in the belief that the person to be arrested has committed or is committing a crime."

Weyant, 101 F.3d at 852.  "The question of whether or not probable cause existed may be

determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge

of the officers."  Id. at 852.

       "'[I]t is well-established that a law enforcement official has probable cause to

arrest if he received his information from some person, normally the putative victim or

eyewitness.'"  Martinez v. Simonetti, 202 F.3d 625, 634 (2d Cir. 2000) (quoting Miloslavsky v.

AES Eng'g Soc'y, 808 F. Supp. 351, 355 (S.D.N.Y. 1992) aff'd, 993 F.2d 1534 (2d Cir. 1993)).

Police officers, when making a probable cause determination, are entitled to rely on the victim's

allegations that a crime has been committed, Martinez, 202 F.3d at 634 (citing Singer v. Fulton

Cnty. Sheriff, 63 F.3d 110, 119 (2d Cir.1995)), unless the circumstances raise doubt as to the

person's veracity.  Singer, 63 F.3d at 119.  They are also entitled to rely on the allegations of

fellow police officers.  Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006) (citing Bernard v.

United States, 25 F.3d 98, 102-03 (2d Cir. 1994)).  Under what is known as the "collective

knowledge doctrine," all information known to one officer is imputed to all other officers

involved in the same investigation.  Golphin, 2011 WL 4375679, at *2 (citing United States v.

Colon, 250 F.3d 130, 135 (2d Cir. 2001)).  "[T]he determination of probable cause does not turn

on whether [the fellow officer's] observations were accurate, but on whether [the arresting

officer] was reasonable in relying on those observations."  Bernard, 25 F.3d at 103.

       In order to determine whether an arrest was supported by probable cause, courts

must consider the "totality of the circumstances" in light of the facts known to the arresting

officer at the time of the arrest.  See Jenkins v. City of New York, 478 F.3d 76, 90 (2d Cir. 2007)

("[p]robable cause is, of course, evaluated on the totality of the circumstances"); Zellner v.

Summerlin, 494 F.3d 344, 369 (2d Cir. 2007) (citing Devenpeck v. Alford, 543 U.S. 146, 152

(2004) ("Whether probable cause exists depends upon the reasonable conclusion to be drawn

from the facts known to the arresting officer at the time of the arrest.")  It is, therefore, axiomatic

that subsequently discovered evidence cannot be used to cure an arrest that was made without

probable cause.  Mejia v. City of New York, 119 F. Supp. 2d 232, 253 (E.D.N.Y. 2000).  The

eventual disposition of a criminal charge is irrelevant to the probable cause determination for

false arrest.  Allen v. City of New York, 480 F. Supp. 2d 689, 711 (S.D.N.Y. 2007); see also

Pierson v. Ray, 386 U.S. 547, 555 (1967).

 A witness identification that later proves mistaken may nonetheless provide a

basis to find probable cause.  Sanchez v. Port Authority of New York and New Jersey, No. 08–

CV–1028 (RRM)(CLP), 2012 WL 1068078, at *5 (E.D.N.Y. Mar. 29, 2012) (citing Hill v.

California, 401 U.S. 797, 802-03 (1971) (holding that police officers had probable cause to arrest

an individual whose appearance was similar to description in warrant).  "If officers arrest an

individual based on a mistaken identification, that arrest is still constitutionally valid if:  (1) the

police have probable cause to arrest the person sought; and (2) the arresting officer reasonably

believed that the arrestee was that person."  Id.; Seitz v. DeQuarto, 777 F. Supp. 2d 492, 504

(S.D.N.Y. 2011).

 **2.** **Analysis**

  **(a)** **County Defendants**

 County police saw a white Mercedes drag racing on the Hutchinson River

Parkway.  (County R. 56.1 Stmt. ¶ 64)  The driver of the car refused to stop for a marked police

car, intentionally rammed that police car, fled the scene, was tracked by helicopter to 1164

Edison Avenue, and was observed running from his car into the only back entrance to 1164

Edison Avenue.  (Id. ¶¶ 65-69)  County officers had ample cause to believe that a crime had been

committed by the driver of the white Mercedes.  Manganiello v. City of New York, 612 F.3d

149, 161-62 (2d Cir. 2010) (quoting Zellner, 494 F.3d at 368) ("probable cause to arrest exists

when the officers have knowledge of . . . facts and circumstances that are sufficient to warrant a

person of reasonable caution in the belief that an offense has been or is being committed by the

person to be arrested").

      County police also had probable cause to believe that Plaintiff was the driver of

the white Mercedes.  Officer Tierney saw the driver through a car window at a distance of less

than twenty feet.  (County R. 56.1 Stmt. ¶ 80)  Indeed, at that time, the front bumper of his patrol

car was only three feet from the front bumper of the white Mercedes.  (Id. ¶ 79)  The headlights

and emergency lights of Tierney's vehicle illuminated the scene.  (Id. ¶ 80)  Tierney described

the driver as a white male with short brown hair between the ages of 18 and 22, a description that

matches Plaintiff.  (Id.; Jones Decl., Ex. E (Tierney Dep.) at 20-22)

      As noted above, County police tracked the white Mercedes from the air, following

it from the Parkway to a parking spot behind Plaintiff's apartment.  (Id. ¶ 69)  Officer Lieberman

then saw a figure run into the only back entrance to the building, which led to Plaintiff's

apartment.  (Id. ¶¶ 16, 38, 70)  A police dog, after sniffing the interior of the white Mercedes,

tracked the scent to Plaintiff's apartment.  (Id. ¶ 56; PX 16 (Serlin Dep.) at 12-15)  When Officer

Tierney saw DeMichele outside the apartment, he immediately identified him as the man who

had been driving the Mercedes.  (Id. ¶ 46; PX 13 (Tierney Dep.) at 63)

      While Tierney was mistaken, it is undisputed that Plaintiff closely resembles

Desideri.  Plaintiff testified that he and Desideri look very much alike: "He basically looks like

me just with a different hair style, I guess.  If we both had Yankee hats on and wearing the same

14

clothes, you wouldn't know the difference that night, to be honest.  Because my girlfriend literally seen him places and used to think it was me. . . ."  (Jones Decl., Ex. A (DeMichele Dep.) at 127-28); see also Ex. B (DeMichele 50-H Hearing Tr.) at 47-48 ("He looks exactly like me, just about two inches taller.").  Given the admittedly close resemblance, and the surrounding circumstances, there is no reason to question the bona fides of Officer Tierney's identification.  Sanchez, 2012 WL 1068078 at *5.

Furthermore, it is undisputed that Desideri was inside Plaintiff's apartment when the police knocked on the door, and that his uniquely customized white Mercedes with the black roof – the car involved in the high speed chase – was parked outside that apartment.  (County R. 56.1 Stmt. ¶ 47; Jones Decl., Ex A (DeMichele Dep.) at 163, 485-87; City R. 56.1 Stmt. ¶¶ 113-14 )  In sum, it is undisputed that County police followed the right vehicle to the right location, and knocked on the door to the apartment into which the suspect had fled.

Based on Officer Tierney's eyewitness identification, the helicopter's observation of the path of the white Mercedes and its driver's flight into the back entrance of 1164 Edison Ave, and the presence of the customized Mercedes in back of Plaintiff's apartment, the County Defendants had probable cause to arrest Plaintiff.  Accordingly, the County Defendants' motion for summary judgment concerning Plaintiff's false arrest claims will be granted.

### (b)   City Defendants

Guerrerio told NYPD officers at the 45th Precinct that he had met two men at a golf course in the Bronx for the purpose of selling them car parts.  When he arrived at the appointed time, the two men – one of whom claimed to have a gun – robbed him of the car parts and a cell phone.  Guerrerio told police that the two men drove away in a customized white Mercedes C63 with a black top.  (Nyugen Decl., Ex. B (Guerrerio Aff.) ¶ 5; PX 24 (Complaint

Report))  In sum, the NYPD had probable cause to believe that a crime had been committed.
Martinez, 202 F.3d at 634.

While Guerrerio was at the 45th Precinct reporting the robbery, officers heard
about a high speed chase involving a white Mercedes C63 with a black roof – the same car
Guerrerio had described.  (Nyugen Decl., Ex. B (Guerrerio Aff.) ¶ 10; PX 26 (Ferrer Dep.) at 14)
Police brought Guerrerio to 1164 Edison Avenue, where the white Mercedes had been tracked by
helicopter.  (PX 26 (Ferrer Dep.) at 16)  At that location, Guerrerio identified Plaintiff as one of
the robbers, and the white customized Mercedes parked outside Plaintiff's apartment as the car
that they had driven.  (Nyugen Decl., Ex. B (Guerrerio Aff.) ¶¶ 12-13)  Accordingly, the victim –
who had been robbed only two-to-three hours earlier in a face-to-face transaction – identified
Plaintiff as the perpetrator.  (Nyugen Decl., Ex. B (Guerrerio Aff.) ¶¶ 4-6, 11-13)

While Guerrerio's identification, like Tierney's, was wrong, that mistake is
attributable to the close resemblance between Plaintiff and Desideri.  (Jones Decl., Ex. A
(DeMichele Dep.) at 127-28)  Moreover, Guerrerio was undoubtedly influenced by the presence
of the unique customized white Mercedes he had observed during the robbery outside Plaintiff's
apartment.  (City R. 56.1 Stmt. ¶¶ 106, 113)

Where, as here, police arrest a suspect based on eyewitness identification, there is
probable cause for the arrest.  See, e.g., Wahhab v. City of New York, 386 F. Supp. 2d 277, 287
(S.D.N.Y. 2005) (finding that police had probable cause to arrest a suspect in response to a 911
call from an eyewitness); Russell v. Eighty Fourth Precinct, No. 03–CV–6179, 2004 WL
2504646, at *3 (E.D.N.Y. Nov. 8, 2004) (finding that police had probable cause to arrest a
suspect based on eyewitness identification).

Guerrerio's identification was also corroborated.  The unique vehicle he described
the robbers having used was found outside Plaintiff's apartment.  Moreover, County Officer

16

Tierney – in the presence of one or more NYPD officers – identified Plaintiff as the driver of that vehicle. (County R. 56.1 Stmt. ¶ 46; PX 13 (Tierney Dep.) at 62-63; Nyugen Decl., Ex. B (Guerrerio Aff.) ¶ 5) In light of Guerrerio's identification of Plaintiff as his assailant, the presence of the customized car outside Plaintiff's apartment, and Tierney's identification of Plaintiff as the driver of that car, no rational fact-finder could conclude that, under the totality of the circumstances, the NYPD lacked probable cause to arrest Plaintiff.[7]

While Plaintiff argues that Sergeant Mellusi improperly ignored his parents' claims that he was innocent, "once an officer has probable cause to arrest a suspect, the officer need not investigate . . . claims of innocence prior to making the arrest." LaFontaine v. City of New York, No. 08 Civ. 1555(SHS), 2009 WL 3335362, at *5 (S.D.N.Y. Oct. 14, 2009) (citing Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997) ("Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest."); Krause v. Bennett, 887 F.2d 362, 372 (2d Cir. 1989) (noting that law enforcement officers are tasked with "apprehend[ing] those suspected of wrongdoing," not engaging in "a weighing of the evidence")). Here, the officers had probable cause to arrest DeMichele on the basis of Guerrerio's complaint and the identifications at the time of arrest.[8] Indeed, the police had no reason to doubt that Plaintiff had committed the robbery.[9]

---

[7] In arguing that the City Defendants did not have probable cause to arrest him, Plaintiff relies on Guerrerio's statements in the days after the arrest. (See, e.g., Ptlf. R. 56.1 Stmt. ¶ QQQ) These statements are not relevant to whether there was probable cause at the time of the arrest, however. See Mejia, 119 F. Supp. 2d at 253 (probable cause determination is based on the information possessed or reasonably available to an officer at the time of the arrest).

[8] Plaintiff mistakenly argues that DiCarlo and Urprasad did not have probable cause to arrest him, because they relied on information provided by other officers. (Ptlf. Sum. J. Br. at 17) Police officers are entitled to rely on information provided by other officers, however, and each individual officer need not have probable cause to arrest. Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006) (police officers are entitled to rely on information provided by fellow officers)

Plaintiff argues, however, that the showup identifications prevent a finding of probable cause.  Plaintiff argues too much time had passed between the crime and the identifications; that the distance from the scene of the robbery was too great; that Guerrerio's identification was unreliable because Plaintiff was in the back of a police car, in handcuffs, in his underwear, with blood on his face; and that officers urged Guerrerio to identify Plaintiff as the robber.

Showup identification procedures are generally disfavored by the courts, Stovall v. Denno, 388 U.S. 293, 301 (1967), but may be justified by extenuating circumstances.  United States v. Concepcion, 983 F.2d 369, 377-78 (2d Cir. 1992); United States v. Bautista, 23 F.3d 726, 730 (2d Cir. 1994) (The Second Circuit "has instructed law enforcement officials that where an officer has or should have doubts whether a detained suspect is in fact the person sought, the officer must make immediate reasonable efforts to confirm the suspect's identity.") (internal quotation marks omitted)).  The Second Circuit has noted that "'it is now settled law that prompt on-the-scene confrontation is 'consistent with good police work' and does not offend the principles established in United States v. Wade."  James v. Marshall, No. CV-05-1982 (BMC), 2007 WL 3232513, at *10 (E.D.N.Y. Oct. 31, 2007) (quoting United States ex rel. Cummings v. Zelker, 455 F.2d 714 (1972)).  Promptly conducted, on-the-scene showups make it possible for the police to have "reasonable assurances that they have arrested or detained the right person." People v. Duuvon, 77 N.Y.2d 541, 545 (1991); see also United States v. Brown, No. (S1) 94 Cr. 631 (AGS), 1995 WL 464956, at *4 (S.D.N.Y. Aug. 7, 1995); Styles v. Van Zandt, No. 94 Civ. 1863 (MGC), 1995 WL 326445, at *4 (S.D.N.Y. May 31, 1995)).  Appropriate factors to

---

[9]  Plaintiff did not tell police that Desideri had run into his apartment and was hiding inside, even though he suspected that the police were looking for Desideri.  (Jones Decl., Ex. A (DeMichele Dep.) at 487).

consider in determining if a particular showup is unduly suggestive include proximity in time and location to the point of arrest, as well as the "uncertain, emergent realities and varieties of these street situations."  Duuvon, 77 N.Y.2d at 545; see also People v. Hicks, 68 N.Y.2d 234 (1986); People v. Brnja, 50 N.Y.2d 366 (1980).  An unduly suggestive showup has not, in itself, been held to be a constitutional violation.  Wray v. City of New York, 490 F.3d 189, 193 (2d Cir. 2007).

In the context of a Section 1983 case, "the relevant inquiry for purposes of probable cause is whether the flaws in the [identification] procedures increased the risk of a misidentification to an extent that the resulting identification no longer supports the requisite probability that the suspect has perpetrated a crime."  See Williams v. City of New York, No. 10–CV–2676 (JG)(LB), 2012 WL 511533, at *7 (E.D.N.Y. Feb. 15, 2012) (factors used to determine admissibility of identification at trial need not be applied where the issue is probable cause).  Since the probable cause standard requires much less certainty than that necessary for a conviction, the evidence required need not be as reliable.  Williams, 2012 WL 511533 at *7. "Concerns about reliance on tainted evidence to convict a defendant at trial do not apply with nearly the same force when such evidence is used to establish probable cause."  Id.

Here, the procedures used did not "'render [the identifications] so defective that probable cause could not reasonably be based upon [them].'"  Id. (quoting Jenkins v. City of New York, 478 F.3d 76, 93 (2d Cir. 2007)).  Guerrerio identified Plaintiff two to three hours after the robbery, at a location approximately four miles away.  The identification was thus not distant either in time or place.  (Nguyen Decl., Ex. D;  Ex. B (Guerrerio Aff.) ¶ 11)  In the habeas context, courts have upheld showup identifications that took place two hours after the incident. See, e.g., Dixon v. Miller, No. 03-cv-1611, 2005 WL 3240482, at *8 (E.D.N.Y. Nov. 30, 2005) (admission of showup identification that took place one to two hours after the crime, when a

witness was brought to the scene of petitioner's arrest, was not "unreasonable in light of precedent"); McBride v. Senkowski, No. 98 CIV. 8663(MBM), 2002 WL 523275, at *5-6 (S.D.N.Y. Apr. 8, 2002) (showup identification two hours after crime, where the victim was brought to a location two blocks from the crime scene to identify suspects, found not unduly suggestive).

The fact that Plaintiff was shown to Guerrerio in handcuffs, and in the back of a police car, does not mean that the circumstances surrounding the showup identification were unduly suggestive.  See Charlemagne v. Goord, No. 05 Civ. 9890(DAB)(HBP), 2008 WL 2971768, at * 12 (S.D.N.Y. June 30, 2008) (citing cases holding that showup procedures, in which suspects were shown in handcuffs and surrounded by police officers, were not unduly suggestive); see also Jamison v. Grier, No. 01 CIV 6678 (AGS) (AJP), 2002 WL 100642, at *20-21 (S.D.N.Y. Jan. 25, 2002) (showup procedures found not unduly suggestive where defendant was shown to eyewitness in handcuffs) (citing United States v. Ortiz, 99 Cr. 532, 2000 WL 37998 at *1 (S.D.N.Y. Jan. 18, 2000) (showup identification procedures not unduly suggestive where "defendants [were] in handcuffs, standing beside a marked police car, and accompanied by uniformed police officers")); Jones v. Strack, No. 99 Civ. 1270(AJP) (LA),1999 WL 983871, at *11 (S.D.N.Y. 1999) (showup identification after street crime not unduly suggestive where defendant was "surrounded by police, with lights flashing, within a few blocks of the incident"); United States v. Butler, 970 F.2d 1017, 1021 (2d Cir. 1992) (identification found proper where suspects were brought to robbery victim who was sitting in a police car); United States v. Nelson, 931 F. Supp. 194, 197, 199-200 (W.D.N.Y. 1996) (showup identification in which single suspect was taken in handcuffs to eyewitnesses after hot pursuit not unnecessarily suggestive)). These cases reason that handcuffs are often "necessary incidents of an on-the-scene

20

identification" and do not "render the pre-trial identification procedure unnecessarily suggestive." Ortiz, 2000 WL 37998 at *1.

Plaintiff also complains that officers suggested to Guerrerio that Plaintiff was the robber, by saying, in sum or substance, "this is him," "this is the person," and "we have his car over there." (Pltf. R. 56.1 Stmt. ¶ SSS; PX 7 (DeMichele Dep.) at 175-76)

Assuming that these statements were made, the Court finds – under the totality of circumstances – that they did not "increase[] the risk of a misidentification to [such] an extent that the resulting identification no longer supports the requisite probability that the suspect has perpetrated a crime." Williams, 2012 WL 511533, at *7. Even absent these statements, it would have been obvious to Guerrerio that the police believed that Plaintiff was the perpetrator; this is an inherent factor in most showup identifications. Guerrerio's identification was based on much more than police suspicion, however. He had had a face-to-face encounter two to three hours earlier with a man who had robbed him of car parts and his cell phone. (Jones Decl., Ex. D (Guerrerio Aff.) ¶ 5) It is obvious that he not only had every motive to be paying attention, but that he did pay attention: he accurately described the uniquely customized vehicle that the perpetrator was driving. And the probable cause determination here did not rest exclusively on Guerrerio's identification of Plaintiff. It was bolstered by, inter alia, (1) Guerrerio's statement to the police that the car parked outside Plaintiff's apartment "was identical to the car that was involved in [the] robbery" (Jones Decl., Ex. D (Guerrerio Aff.) ¶ 12); (2) the fact that police had tracked the robber's uniquely customized vehicle to a location immediately outside Plaintiff's home; (3) the fact that a police dog had then tracked the scent inside the vehicle directly to Plaintiff's apartment; and (4) Officer Tierney's identification of Plaintiff as the driver of that vehicle.

Probable cause requires only a probability, and not "hard certainties" or even a prima facie showing of criminal activity.  Walczyk v. Rio, 496 F.3d 139, 156-57 (2d Cir. 2007); see also Illinois v. Gates, 462 U.S. 213, 231-32, 235 (1983).  That standard was met here. Because NYPD officers had probable cause to arrest Plaintiff, the City Defendants' motion for summary judgment on Plaintiff's false arrest claims will be granted, and Plaintiff's motion for summary judgment on his false arrest claims will be denied.

## III.   EXCESSIVE FORCE[10]

Plaintiff has moved for summary judgment on his excessive force claims against Officer Ruiz, while the County and County Defendants Tierney, Ruiz, and Gutierrez, and City Defendant Bugge, seek summary judgment dismissing Plaintiff's excessive force claims against them.  Plaintiff argues that Ruiz's liability has been established as a matter of law, while the County argues that (1) "any force used by the County Defendants while placing Plaintiff under arrest was de minimis, conformed to standardized techniques provided by New York State and [was] not violative of Plaintiff's Constitutional rights"; and (2) Plaintiff has not demonstrated that Tierney, Ruiz, and Gutierrez were personally involved in the use of excessive force. (County Sum. J. Br. 6)  City Defendant Bugge likewise argues that Plaintiff has not demonstrated that he was personally involved in the use of excessive force.  (City Sum. J. Br. 17-18)  The County also contends that its officers are entitled to summary judgment on qualified immunity grounds.  (County Sum. J. Br. 7)  The Court concludes that material issues of fact concerning Plaintiff's excessive force claims preclude a ruling as a matter of law.

### A.   Legal Standard

---

[10]  Plaintiff's Section 1983 excessive force claim is brought against the City, the County, NYPD Deputy Inspector Bugge, NYPD Captain Urprasad, and County Officers Tierney, Ruiz, and Gutierrez.  (Am. Cmplt., First Cause of Action)

An excessive force claim that arises in the context of an arrest invokes the protections of the Fourth Amendment, which guarantees citizens the right "to be secure in their person . . . against unreasonable . . . seizures."  Graham v. Connor, 490 U.S. 386, 394 (1989).  In order to establish that an officer used excessive force, the plaintiff must demonstrate, "in light of the totality of the circumstances faced by the arresting officer, [that] the amount of force used was objectively [un]reasonable at the time."  Amnesty Am. v. Town of West Hartford, 361 F.3d 113, 123 (2d Cir. 2004) (citing Graham, 490 U.S. at 397).  See also Batson-Kirk v. City of New York, No. 07-CV-1950, 2009 WL 1505707 (KAM)(JMA), at *11 (E.D.N.Y. May 28, 2009); Mickle v. Morin, 297 F.3d 114, 120 (2d Cir. 2002).

Because "[t]he Fourth Amendment test of reasonableness 'is one of objective reasonableness,'" Bryant v. City of New York, 404 F.3d 128, 136 (2d Cir. 2005) (quoting Graham, 490 U.S. at 399), the inquiry is necessarily case and fact specific and requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake.  Amnesty Am., 361 F.3d at 123.  In balancing these interests, a court must consider, inter alia, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Id. (quoting Graham, 490 U.S. at 396); see also Jones v. Parmley, 465 F.3d 46, 61 (2d Cir. 2006).  A court must consider the evidence "'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"  Tracey v. Freshwater, 623 F.3d 90, 96 (2d Cir. 2010) (quoting Jones, 465 F.3d at 61).  Moreover, courts must "make 'allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.'"  Id. (quoting Graham, 490 U.S. at 397).  Nonetheless, the Second Circuit has cautioned that, "[g]iven the fact-

specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive

force claim is not appropriate unless no reasonable factfinder could conclude that the officers'

conduct was objectively unreasonable." Amnesty Am., 361 F.3d at 123 (citing O'Bert v. Vargo,

331 F.3d 29, 37 (2d Cir. 2003)).

      "'Frequently, a reasonable arrest involves handcuffing the suspect, and to be

effective handcuffs must be tight enough to prevent the arrestee's hands from slipping out.'"

Castro v. Cnty. of Nassau, 739 F. Supp. 2d 153, 176 (E.D.N.Y. 2010) (quoting Esmont v. City of

New York, 371 F. Supp. 2d 202, 214 (E.D.N.Y. 2005)).  Placing handcuffs on an arrestee tight

enough to cause nerve damage may, however, constitute excessive force in violation of the

Fourth Amendment.  Warren v. Williams, No. Civ.A. 304CV537 (JCH) 2006 WL 860998, at

*36 (D. Conn. Mar. 31, 2006) (citing Kopec v. Tate, 361 F.3d 772, 777 (3d Cir. 2004); Lucky v.

City of New York, 03 Civ.1983, 2004 WL 2088557, at *7 (S.D.N.Y. Sept. 20, 2004)).  To

determine whether the handcuffing of an arrestee was reasonable, the handcuffing must be

viewed "in light of the minimal amount of force necessary to maintain custody of [the arrestee]."

Esmont, 371 F. Supp. 2d at 215.  "[I]n evaluating the reasonableness of handcuffing, a Court is

to consider evidence that:  (1) the handcuffs were unreasonably tight; (2) the defendants ignored

the arrestee's pleas that the handcuffs were too tight; and (3) the degree of injury to the wrists."

Id. (citing Burchett v. Kiefer, 310 F.3d 937, 944-45 (6th Cir. 2002) (additional citation omitted)).

      Applying these standards here, the Court cannot find as a matter of law either that

the use of force was justified or that it was excessive.  There is conflicting evidence as to, inter

alia, the nature of the force that was used, who employed that use of force, and the degree to

which Plaintiff was resisting arrest.

    **B.**     **Resistance Offered and Force Used**

Beginning with the three factors cited in <u>Amnesty America</u>, 361 F.3d at 123 –
"the severity of the crime . . . , whether the suspect poses an immediate threat to the safety of the
officer or others, and whether he is actively resisting arrest or attempting to evade arrest by
flight" – the crime at issue – armed robbery – was extremely serious.  Given that the victim
reported that the suspect had threatened to shoot him (Jones Decl., Ex. D (Guerrerio Aff.) ¶ 5),
the officers had good cause to fear for their safety.  The suspect had also fled from police;
indeed, the suspect had led the police on a high-speed car chase from the Hutchinson River
Parkway in Westchester County to a location in the Bronx, smashing his car into a police cruiser
along the way in order to evade capture.

It is undisputed that Gutierrez – with the help of other officers – placed handcuffs
on Plaintiff, and that he was then led out of the back yard of 1164 Edison Avenue.  (County R.
56.1 Stmt. ¶ 54; Pltf. R. 56.1 Stmt. ¶¶ II-LL; PX 7 (DeMichele Dep.) at 148)  It is likewise
undisputed that Ruiz used "cuff control"[11] "to gain [Plaintiff's] compliance."  (PX 11 (Ruiz
Dep.) at 84)  The remaining facts about this incident are very much in dispute.

Plaintiff admits that while up against the brick wall, he turned his head from side
to side (County R.56.1 Stmt. ¶¶ 52, 90; <u>see also</u> Jones Decl., Ex. E (Tierney Dep.) at 81), but
denies that he resisted arrest in any other way.  (PX 7 (DeMichele Dep.) at 143-44)  Brescia also
testified that Plaintiff was not resisting arrest, and would not have been able to resist arrest,
because the officers "had him."  (Jones Decl., Ex. C (Brescia Dep.) at 166)

According to Plaintiff, however, he was pushed into a wall, the police repeatedly
"stomped" on his bare feet, his head was repeatedly driven into the brick wall, he was repeatedly
punched in the ribs, he was "thrown down onto the floor in the backyard" "face forward," and

---

[11]  Ruiz explains that "cuff control" is "when handcuffs are placed on the suspect, you twist the
hands at a pressure point on the wrists . . .  basically using pressure points to gain compliance."
(PX 11 (Ruiz Dep.) at 85-86)  "It is not tightening the handcuffs.  Maneuvering either back or
forth."  (<u>Id.</u> at 91)

then picked up by the handcuffs attached to his wrists.[12]  (PX 7 (DeMichele Dep.) 144-48, 153, 155-58)  Plaintiff claims that the blows were severe enough to cause bleeding on his feet, from his head, and in his mouth, and Plaintiff "felt like [he] was going to pass out."  (Id. at 146, 148)  As Plaintiff was led out through the backyard of 1164 Edison, a police officer told him to "say good-bye to [his] pretty Mercedes."  (Id. at 161)  After Plaintiff replied, "that's not my car," the officer punched him in the face, and he fell to the ground.  (Id. at 161, 166)

Plaintiff asserts that the handcuffs were tight enough to cause bruising to his wrists (id. at 143), and there is evidence that he sustained bruising on his wrists, neck and the back of his head, a gash to his knee, and a cut above his left eye.  (PX 20, 21; Jones Decl., Ex. J (Ruiz Dep.) at 93-94)  Officer Serlin testified that he observed "blood near the bridge of [DeMichele's] nose."  (Pltf. R. 56.1 Stmt. ¶ VV; PX 16 (Serlin Dep.) at 31)  DeMichele testified that he sought medical treatment after his release on bail, because he was feeling pain throughout his body, including his head, neck, back, arms, wrists, knees, and feet.  (PX 7 (DeMichele Dep.) at 251; see also Pltf. Resp. to County R. 56.1. Stmt., Ex. 5 (letter from treating physician))

The police officers tell a very different story.  Officer Serlin testified that the Plaintiff began "to flail his arms and struggle with the NYPD Officers" before starting to walk up the stairs from his basement apartment.  (PX 16 (Serlin Dep.) at 18-19)  Serlin stated that the NYPD officers "had their hands on him.  They were trying to subdue him but he was not allowing them to."  (Id.)  "[Plaintiff] continued to fight and kick, throw his arms around, disregard, I guess, their commands.  I could hear them yelling at him at that point, 'Stop resisting,' which he didn't."  (Id.  at 20)

---

[12]  DeMichele testified that it was Defendant Urprasad who punched him in the ribs, "stomped" onto his bare feet, and lifted him from the ground by his handcuffs.  ((Pltf. R. 56.1 Stmt. ¶¶ RR, SS, TT; PX 8 (DeMichele Dep.) at 435-36)

Officer Tierney also testified that Plaintiff resisted arrest by failing to comply with police orders to put his hands behind his back, flailing his arms, and not cooperating with the officers. (Jones Decl., Ex E (Tierney Dep) at 73)  Tierney testified that DeMichele kept pulling his arms away, and turning his head from side to side, but eventually he was pushed up against a brick wall and placed in handcuffs. (Id. at 81-82).

Officer Ruiz likewise testified that Plaintiff resisted arrest, flailed his arms, attempted to kick him and Officer Gutierrez, and at one point broke free from their grasp while in the rear yard. (PX 11 (Ruiz Dep.) at 44, 47, 84)  Officer Gutierrez also testified that Plaintiff refused to walk while the officers were escorting him to the police car. (PX 10 (Gutierrez Dep.) at 175-79)  Urprasad denies having punched DeMichele or seeing any other officer striking him. (PX 30 (Urprasad Dep.) at 65-66, 70).  Officer Gutierrez also testified that no police officer struck Plaintiff. (PX 10 (Gutierrez Dep.) at 175-79)

In sum, there are material issues of fact concerning both the extent to which Plaintiff resisted arrest and the degree of force that was used in effecting Plaintiff's arrest. "Plaintiff['s] allegations are sufficient to create issues of fact as to the objective reasonableness of the degree of force used by the police officers.  Plaintiff[] aver[s] that [his] resistance to arrest was purely passive, and that the police used more force than was necessary to [effect the arrest]. [The Second Circuit has] previously held that allegations involving comparable amounts of force used during the arrest of a nonviolent suspect are sufficient to allow a reasonable factfinder to conclude that the force used was excessive." Amnesty Am., 361 F.3d at 123-24 (plaintiffs thrown to ground, dragged on the ground face down, and had head slammed into a wall) (citing Robison v. Via, 821 F.2d 913, 923-24 (2d Cir. 1987) (evidence that police yanked arrestee out of

a car, threw her against it, and pinned her arm behind her back were sufficient to withstand summary judgment in excessive force case).[13]

        Plaintiff's motion for summary judgment on his excessive force claim against Officer Ruiz will be denied.  The County Defendants' summary judgment motion concerning Plaintiff's excessive force claim will likewise be denied to the extent that it is premised on the argument that "any force used by the County Defendants while placing Plaintiff under arrest was de minimis, conformed to standardized techniques provided by New York State and [was] not violative of Plaintiff's Constitutional rights."  (County Sum. J. Br. 6)

### C.      Personal Involvement

        County Defendants Tierney, Gutierrez, and Ruiz, and City Defendant Bugge, contend that DeMichele's excessive force claim against them must be dismissed because he has not demonstrated their personal involvement.

        "'In this Circuit, personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  Smith v. New York City Police Dept, No. 06 Cov. 15436 (JSR)(KNF), 2010 WL 423039, at *4 (S.D.N.Y. Feb. 4, 2010) (quoting McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977).  "To survive a motion for summary judgment, there must be some evidence of the personal involvement of each defendant

---

[13] While a plaintiff who suffers only de minimis injuries may not be able to survive summary judgment on an excessive force claim, the injuries here are sufficient to trigger potential liability for excessive force.  See, e.g., Robison, 821 F.2d at 923-24 (summary judgment denied where officer twisted plaintiff's arm and she suffered a bruise of unspecified extent and degree; no evidence that bruise persisted or required medical treatment); Mickle v. Morin, 297 F.3d 114, 120-21 (2d Cir. 2002) (citing cases) (reversing judgment as a matter of law where plaintiff alleged injury from the use of handcuffs that were allegedly too tight); Davis v. City of New York, No. 04-CV-3299 (JFB)(RLM), 2007 WL 755190, at *12-13 (E.D.N.Y. Feb. 15, 2007) (denying summary judgment where plaintiff alleged redness and soreness in shoulder after officer kicked her); see also Blair v. City of New York, No. 03 CV 1485(SLT)(CLP), 2009 WL 959547, at *10-11 (E.D.N.Y. Mar. 31, 2009) (rejecting need to show continuing or long-term injury or medical treatment); Sforza v. City of N.Y., No. 07 Civ. 6122(DLC), 2009 WL 857496, at *15 (S.D.N.Y. Mar. 31, 2009) ("[P]laintiff need not demonstrate serious injury to prevail in an excessive force claim; bruising and other nonpermanent injuries are sufficient.").

in the alleged constitutional deprivation." Ricks v. O'Hanlon, No. 07 Civ. 9849(WHP), 2010

WL 245550, at *4 (S.D.N.Y. Jan. 19, 2010) (citing Williams v. Smith, 781 F.2d 319, 323 (2d

Cir. 1986); Universal Calvary Church v. City of New York, No. 96 Civ. 4606(RPP), 2000 WL

1538019, at *16 (S.D.N.Y. Oct. 17, 2000). "'Personal involvement' is a question of fact,

governed by the general rule that summary judgment may be granted only if no issues of material

fact exist." Shankle v. Andreone, No. 06–CV–487 (NG)(LB), 2009 WL 3111761, at *5

(E.D.N.Y. Sept. 25, 2009) (citing Williams, 781 F.2d at 323). "A police officer is personally

involved in the use of excessive force if the officer either:  (1) directly participates in an assault;

or (2) is present during the assault, and fails to intercede on behalf of the victim even though he

had a reasonable opportunity to do so." Vesterhalt v. City of New York, No. 07 Civ.

2142(MGC), 2009 WL 3424122, at *3 (S.D.N.Y. Oct. 26, 2009) (citing Ricciuti v. New York

City Transit Auth., 124 F.3d 123, 129 (2d Cir. 1997)); see also Shankle, 2009 WL 3111761, at

*5 ("personal involvement may . . . be proved by, among other things, a defendant's failure to

remedy an alleged constitutional violation after learning of it or a defendant's gross negligence in

managing subordinates" (citing Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 229 (2d Cir.

2004); Lehman v. Kornblau, 134 F. Supp. 2d 281, 288 (E.D.N.Y. 2001)).

        "[A]n arrestee's 'inability to positively identify those who allegedly violated his

rights is not per se fatal to his claims.'" Shankle, 2009 WL 3111761, at *5 (quoting Davis v.

Callaway, No. 3:05CV00127, 2007 WL 1079988, at *8 (D. Conn. April 9, 2007) and citing

Munoz v. Martinez, No. 03 CV 0828(LAK), 2005 WL 1355094 (S.D.N.Y. June 8, 2005) ("A

plaintiff need not establish who, among a group of officers, directly participated in the attack and

who failed to intervene.")) "This is especially true where the acts complained of . . . if true . . .

are likely to have prevented plaintiff from identifying which [officers] specifically engaged in

the bad acts." Shankle, 2009 WL 3111761, at *5 (citing Davis, 2007 WL 1079988, at *9); see

29

Shankle, 2009 WL 3111761, at *5-6 (summary judgment denied even though plaintiff was

"unable to identify the particular officers who subjected him to excessive force"); Munoz v.

Martinez, No. 03 Civ. 0828(LAK), 2005 WL 1355094, at *5 (S.D.N.Y. June 8, 2005) (arrestee

"must submit some sort of evidence that [officer] was present at the scene of the alleged assault"

to survive summary judgment on personal involvement).

    Here, it is undisputed that all four officers – Tierney, Gutierrez, Ruiz, and Bugge

– were present at DeMichele's arrest at the time of the alleged use of excessive force (PX 2 (SUI

Report) at P226-P230; County Resp. to Pltf. R. 56.1 Stmt. ¶¶ HH-OO; PX 29 (Bugge Dep.) at

28-31, 36-41), and that Ruiz, Gutierrez, and Tierney were all involved in handcuffing Plaintiff.

(PX 13 (Tierney Dep.) at 76; PX 10 (Gutierrez Dep.) at 35; PX 11 (Ruiz Dep.) at 83-85)

Moreover, DeMichele testified that there were multiple officers around him when he suffered the

blows described above, and that, for part of the time he was beaten, his face was up against a

brick wall (PX 7 (DeMichele Dep.) at 141), preventing him for seeing which officers were taking

what actions.  Although DeMichele cannot say for certain which officers allegedly assaulted him

and in what way, Plaintiff "need not establish who, among a group of officers, directly

participated in the attack and who failed to intervene," Jeffreys v. Rossi, 275 F. Supp. 2d 463,

474 (S.D.N.Y.2003) (citing Skorupslki v. Cnty of Suffolk, 652 F. Supp. 690, 694 (E.D.N.Y.

1987) ), as long as "there [was] a realistic opportunity to intervene to prevent the harm from

occurring." Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994) (citing O'Neill v. Krzeminski,

839 F.2d 9, 11 (2d Cir. 1988)); Husbands ex rel. Forde v. City of New York, No. 05 Civ.

9252(NRB), 2007 WL 2454106, at *11 (S.D.N.Y. Aug. 16, 2007).  Given that Tierney,

Gutierrez, Ruiz, and Bugge were concededly all present when the alleged, repeated acts of abuse

took place, they had an opportunity to intervene.  Accordingly, the County Defendants' motion

for summary judgment on Plaintiff's excessive force claim will – as to Officers Tierney,

Gutierrez, Ruiz – be denied.  Defendant Bugge's motion for summary judgment on the excessive force claim will likewise be denied.  See Ricks, 2010 WL 245550, at *5 (citing Younger v. City of N.Y., 480 F. Supp. 2d 723, 731-33 (S.D.N.Y.2007) (summary judgment denied on personal involvement grounds where arrestee alleged officers' presence and a police report listed them as present at the scene).

> D.     **Qualified Immunity**

The County argues that Plaintiff's excessive force claim against the County officers must be dismissed on qualified immunity grounds.[14]  (County Sum. J. Br. 7)  As a general matter, police officers who violate a plaintiff's constitutional rights are nevertheless entitled to qualified immunity if their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Stephenson v. Doe, 332 F.3d 68, 76 (2d Cir. 2003).  It is well established that "use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness."  Saucier v. Katz, 533 U.S. 194, 201-02 (2001), overruled in part on other grounds by Pearson v. Callahan, 555 U.S. 223 (2001) (citing Graham v. Connor, 490 U.S. 386 (1989)).  However, identifying the generalized constitutional protection is not enough; the law must be "clearly established in a more particularized sense," Kerman v. City of New York, 261 F.3d 229, 236 (2d Cir. 2001) (citing Anderson v. Creighton, 488 U.S. 635, 640 (1986)), that is, "in . . . the specific context of the case."  Saucier, 533 U.S. at 201.  The Supreme Court has made clear that officers who have used excessive force may be entitled – under the qualified immunity doctrine – to an extra layer of protection "from the sometimes hazy border between excessive and acceptable force."  Id. at 206.  The relevant inquiry "is whether it would be clear to a reasonable officer that his conduct

---

[14]  To the extent that the City Defendants and the County Defendants argue that they are entitled to summary judgment on Plaintiff's false arrest claims on qualified immunity grounds (City Sum. J. Br. 16; County Sum. J. Br. 7), their motions are denied as moot.

was unlawful in the situation he confronted."  Id. at 202; see Loria v. Gorman, 306 F.3d 1271, 1286 (2d Cir. 2002) ("Said differently, . . . we analyze the objective reasonableness of the officer's belief in the lawfulness of his actions.").

As to the County officers named as defendants in Plaintiff's excessive force claim, there are material issues of fact that preclude summary judgment on their qualified immunity defense.  If, as Plaintiff and other witnesses have testified, Plaintiff was not resisting arrest but was nonetheless beaten, the officers could not have reasonably believed that their actions were lawful.  Resolution of Plaintiff's excessive force claim and Defendants' qualified immunity defense requires credibility determinations that are the province of a jury.  See Azrielli v. Cohen Law Offices, 21 F.3d 512, 517 (2d Cir. 1994).

To the extent that the County Defendants' motion for summary judgment on Plaintiff's excessive force claim is predicated on qualified immunity, it will be denied.

## IV.   **MALICIOUS PROSECUTION**

Plaintiff and the City Defendants have cross-moved for summary judgment on Plaintiff's Section 1983 and state law claims for malicious prosecution against the City and NYPD officers Urprasad, Mellusi, and DiCarlo.

### A.   **Legal Standard**

"To state a claim for malicious prosecution [under New York law], a plaintiff must show (1) the initiation or continuation of a criminal proceeding against the plaintiff; (2) termination of the proceeding in the plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions."  Drummond v. Castro, 522 F. Supp. 2d 667, 677 (S.D.N.Y. 2007) (citing Russel v. Smith, 68 F.3d 33, 36 (2d Cir. 1995).  To prevail on a Section 1983 malicious prosecution claim, a plaintiff must establish these four elements and also show that "his Fourth Amendment rights were violated after legal

proceedings were initiated."  Douglas v. City of New York, 595 F. Supp. 2d 333, 341 (S.D.N.Y. 2009) (citing Fulton v. Robinson, 289 F.3d 188, 195 (2d Cir. 2002) (citations omitted).  To satisfy the constitutional element, plaintiff must show a seizure or other "perversion of proper legal procedures" implicating plaintiff's personal liberty and privacy interests under the Fourth Amendment.  Washington v. Cnty. of Rockland, 373 F.3d 310, 316 (2d Cir. 2004).

Courts considering a malicious prosecution claim must determine whether, at the time a prosecution was commenced, "there was probable cause to believe the criminal proceeding could succeed and, hence, should be commenced."  Coakley v. 42nd Pct. Case 458, No. 08 Civ. 6206(JSR), 2009 WL 3095529, at *6 (S.D.N.Y. Sept. 28, 2009) (quoting Mejia v. City of New York, 119 F. Supp. 2d at 254).  "As with a false arrest claim, the presence of probable cause is a complete defense to an action for malicious prosecution."  Drummond, 522 F. Supp. 2d at 677 (citing Graebe v. Falcetta, 726 F. Supp. 36, 38 (E.D.N.Y. 1989), aff'd, 946 F.2d 883 (2d Cir. 1991)).  For purposes of a malicious prosecution claim, "the determination of probable cause is assessed in light of the facts known or reasonably believed at the time the prosecution was initiated, as opposed to at the time of arrest."  Id. at 678-79.  "'[E]ven when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause.'  In order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact."  Lowth v. Town of Cheektowaga, 82 F.3d 563, 571 (2d Cir. 1996) (quoting Cox v. Cnty. of Suffolk, 780 F. Supp. 103, 108 (E.D.N.Y. 1991)).

**B.     Analysis**

Given the Court's finding that Plaintiff's arrest was supported by probable cause, Plaintiff must demonstrate that evidence uncovered after his arrest, but before the Criminal Complaint was filed, vitiated probable cause.  Drummond, 522 F. Supp. 2d at 678.

There is no such evidence.  A criminal complaint – signed by Officer DiCarlo – was filed against DeMichele on  January 18, 2009.  (PX 36)  He was arraigned on January 20, 2009, and released on his own recognizance.  (Pltf. R. 56.1 Stmt. ¶¶ TTTT, VVVV)  He was ordered to return to Bronx County Supreme Court on March 26, 2009.  (Pltf. R. 56.1 Stmt. ¶ WWWW)

The record shows that County Detective Fumuso thereafter commenced an investigation that led him to believe that Plaintiff had been wrongly accused.  (Ptlf. R. 56.1 Stmt. ¶ XXXX; Jones Decl., Ex. M (Fumuso Aff.))  In late January 2009, Fumuso shared his concerns with NYPD Detective Fennel.  (City R.56.1. Stmt. ¶ 116)  On February 2, 2009, Det. Fennel arranged for Guerrerio to look at a photo array, and Guerrerio identified Desideri as the man who had robbed him.  (PX 28 (Fennel Dep.) at 57-58)  Fennel notified the Bronx County District Attorney's Office of this development that same day.  (Pltf. R. 56.1 Stmt. ¶ AAAAA)   When Plaintiff returned to Bronx County Supreme Court on March 26, 2009, the People dismissed the charges against him.  (Pltf. R. 56.1 Stmt. ¶ CCCCC; PX 39)

Plaintiff has made no showing that Officer DiCarlo, or Sergeant Mellusi and Captain Urprasad – who allegedly had supervisory responsibility for the filing of the complaint (Pltf. Opp. City Br. 11-14) – had any reason to doubt that there was probable cause to begin a prosecution.  The Court has already found that the City Defendants had probable cause to arrest Plaintiff.  Plaintiff has made no showing that that probable cause dissipated between the arrest and the filing of the criminal complaint.  See Lowth, 82 F.3d at 571.

The City Defendants' motion for summary judgment on Plaintiff's malicious prosecution claims will be granted, and Plaintiff's motion for summary judgment on these claims will be denied.

## V.    <u>MONELL CLAIMS</u>

The City and County argue that they are entitled to summary judgment on all of Plaintiff's claims because he has not demonstrated a basis for <u>Monell</u> liability.  <u>See</u> <u>Monell v. Dep't. of Social Servs. of City of New York</u>, 436 U.S. 658, 694 (1978).  Plaintiff names the City as a defendant in his excessive force, false arrest, malicious prosecution, and assault and battery claims; the County is named as a defendant in Plaintiff's excessive force, false arrest, and assault and battery claims.  (Am. Cmplt.)

As an initial matter, based on the rulings made earlier in this opinion, the City and County are entitled to summary judgment on Plaintiff's <u>Monell</u> claims to the extent that they are predicated on false arrest and malicious prosecution causes of action, because those claims have been dismissed.

A prerequisite to municipal liability under <u>Monell</u> is an underlying constitutional violation by a state actor.  "<u>Monell</u> does not provide a separate cause of action for the failure by the government to train its employees; it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation."  <u>Segal v. City of New York</u>, 459 F.3d 207, 219 (2d Cir. 2006).  Municipal liability under Section 1983 thus requires proof that a particular constitutional or statutory violation was the result of an official policy; "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983."  <u>Monell</u>, 436 U.S. at 694.  The Second Circuit has explained that a plaintiff "must first prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officer.  Second, the plaintiff must establish a causal connection – an 'affirmative

link' – between the policy and the deprivation of his constitutional rights." Vippolis v. Vill. of Haverstraw, 768 F.2d 40, 44 (2d Cir. 1985). To establish liability under Monell, a plaintiff must show that the municipality bore some responsibility for violations of his constitutional rights. See, e.g., City of Canton v. Harris, 489 U.S. 378, 385 (1989).

A plaintiff may demonstrate the existence of a policy or practice in a variety of ways. First, he may provide evidence of a formal policy officially adopted by the municipality. Monell, 436 U.S. at 690. Second, a single unconstitutional act or decision, when taken by an authorized decision-maker, may be considered policy and thus subject a municipality to liability. Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 405-06 (1997). Third, a policy may be established by showing that the acts of the municipal agent were part of a widespread practice that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware. See City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988); Monell, 436 U.S. at 690-91. "'The policy or custom used to anchor liability need not be contained in any explicitly adopted rule or regulation,'" but must be "'persistent and widespread.'" Morpurgo v. Inc. Vill. of Sag Harbor, 697 F. Supp. 2d 309, 325 (E.D.N.Y. 2010) (quoting Sorlucco v. New York Police Dep't, 971 F.2d 864, 870-71 (2d Cir. 1992). Fourth, where a municipality's failure to provide adequate training or supervision of its agents rises to the level of deliberate indifference, Section 1983 liability may lie against the municipality. See, e.g., Brown, 520 U.S. at 407-08; see generally City of Canton, 489 U.S. at 388-89.

"[A] single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." DeCarlo v. Fry, 141 F.3d 56, 61 (2d Cir. 1998) (quoting Ricciuti v. New York City Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991)). Monell liability may spring from a single violation only where the conduct causing the violation was undertaken pursuant to a municipality-wide custom, practice, or

procedure.  Sforza v. City of New York, No. 07 Civ. 6122(DLC), 2009 WL 857496, at *11

(S.D.N.Y. Mar. 31, 2009) (citing DiSorbo v. Hoy, 343 F.3d 172, 180-81 (2d Cir. 2003)).

        In order to prove that a municipality's inaction amounts to deliberate indifference

to the rights of its citizens, a plaintiff must show that:  (1) a policymaker knows "to a moral

certainty" that employees will confront a given situation; (2) the situation either presents the

employee with a difficult choice of the sort that training or supervision will make less difficult,

or that there is a history of employees mishandling the situation; (3) the wrong choice by the city

employee will frequently cause the deprivation of a citizen's constitutional rights.  City of

Canton, 489 U.S. at 390.  City of Canton requires a plaintiff to establish not only that the

officials' purported failure to train occurred under circumstances that could constitute deliberate

indifference, but also that a specific deficiency in the city's training program is "closely related

to the ultimate injury," such that it "actually caused" the constitutional deprivation.  Ambrose v.

City of New York, 623 F. Supp. 2d 454, 465 (S.D.N.Y. 2009) (citing City of Canton, 489 U.S. at

391).  Where a plaintiff has shown only misbehaving officers, but has not offered proof of an

official policy that led to the constitutional or statutory violation, his Monell claim under Section

1983 must fail.  See, e.g., Turpin v. Mailet, 619 F.2d 196, 203 (1980) (reversing jury verdict

against municipality in Section 1983 action where plaintiff failed to show that unlawful arrest

"was made pursuant to any official policy of the City of West Haven").

      **A.**    **City of New York**

        In opposing the City's motion for summary judgment concerning his Monell

claim, Plaintiff argues that "either a lack of training and/or an institutional culture led to the

beating, and arrest and criminal charges, without probable cause."  (Pltf. Opp. City Br. at 21)  As

noted above, because the City Defendants are entitled to summary judgment on Plaintiff's false

arrest and malicious prosecution claims, Monell liability cannot be predicated on these claims.

Claudio v. Sawyer, 675 F. Supp. 2d 403, 409-10 (S.D.N.Y. 2009) (Once a "district court

properly [finds] no underlying constitutional violation, its decision not to address the municipal

defendant's liability under Monell [i]s entirely correct.") (quoting Segal, 459 F.3d at 219); see

also Costello v. City of Burlington, 632 F.3d 41, 49 (2d Cir. 2011) (to prevail on a Monell claim,

plaintiff must show that there was a constitutional violation and that a specific policy or custom

of the municipality caused the violation); Khan v. Ryan, 145 F. Supp. 2d 280, 285 (E.D.N.Y.

2001) ("If there is no underlying constitutional violation by a municipal official, the municipality

is not liable.")

        As to Plaintiff's excessive force claim, he has not pointed to any formal policy,

officially promulgated or adopted by the City, that led to the alleged constitutional deprivation.

Monell, 436 U.S. at 691.  To the contrary, Plaintiff argues that a number of NYPD policies were

violated during his arrest.[15]  (Pltf. Opp. City Br. at 21-22)  Plaintiff has likewise not offered any

evidence that the excessive force allegedly exercised here was "part of a widespread practice"

constituting "a custom or usage of which the supervisor must have been aware."  City of St.

Louis, 485 U.S. at 130.  Similarly, Plaintiff has not offered evidence that any of the named

defendants were authorized to set policy for the City or the NYPD.  Cf. Brown, 520 U.S. 397.

        Indeed, Plaintiff's sole statement concerning Monell liability premised on

excessive force is that "either a lack of training and/or an institutional culture led to . . .

[p]articipation by high-ranking NYPD officers in improper police practices, and observation of

---

[15]  In the event that a defendant NYPD officer violated the NYPD Patrol Guide, that may be
evidence of excessive force, but such proof does not demonstrate that the City was indifferent to
the use of excessive force.  Flemming v. City of New York, No. 02 Civ. 4113(PKC), 2008 WL
80746, at *3 (S.D.N.Y. Jan. 2, 2008) ("While plaintiff's own testimony is evidence that the Patrol
Guide – a City policy – was not followed, that evidence does not equate to evidence that the City
was deliberately indifferent to whether its police officers followed the policy or used excessive
force.").

subordinate officers acting improperly, and failing to take action to stop it." (Pltf. Opp. City Br. at 21-22) This assertion is not sufficient to defeat summary judgment.

Plaintiff has offered no evidence regarding the training – or lack thereof – given to NYPD officers, nor has he offered any proof demonstrating that the City is deliberately indifferent to the use of excessive force. Chiaro v. Cnty. of Nassau State of New York, No. CV 09-3702(SJF)(AKT), 2011 WL 3701804, at *6 (E.D.N.Y. July 11, 2011) (granting summary judgment to County where the record contained no evidence of the County's failure to train its police officers, or any failure that amounted to "deliberate indifference") (citing City of Canton, 489 U.S. at 388)). Plaintiff cites to a report prepared by his expert, Walter Signorelli (Carlino Aff., Ex.D (Signorelli Report)), asserting that a number of violations of police procedures and practices took place in connection with Plaintiff's arrest. This report does not address the training actually provided to NYPD officers, however, and accordingly does not support Plaintiff's Monell claim. Hickey v. City of New York, No. 01 Civ. 6506(GEL), 2004 WL 2724079, at *20 (S.D.N.Y. Nov. 29, 2004). "[I]t is impossible to prevail on a claim that the [municipality's] training program was inadequate without any evidence as to . . . how the training was conducted, how better or different training could have prevented the challenged conduct, or how a hypothetically well-trained officer would have acted under the circumstances." Amnesty Am., 361 F.3d at 130 (quotation omitted).

At best, Plaintiff has shown only misbehaving officers. Because he has not offered evidence of an official policy that led to the alleged excessive force, the City of New York is entitled to summary judgment on his Monell claim.

### B.   Westchester County

In support of his Monell claim against the County, Plaintiff relies exclusively on (1) testimony from Officer Ruiz and Sergeant McGuinness indicating that they believe that "cuff

control" is an "authorized police practice"; and (2) Westchester County Department of Public

Safety General Orders stating that handcuffs should not be used to cause pain or injury, and that

any force used by police must be reasonable under the circumstances.  (Pltf. Opp. County Br. at

22 (citing Carlino Decl., Ex. D (Signorelli Report) at 14; PX 14 (Westchester General Order

§ 41.01); PX 15 (Westchester General Order § 1.02)).  Plaintiff argues that the County officers'

alleged use of excessive force was the product of the County's "failure to train and/or supervise"

and "the organizational culture."  (Id. at 23)

   Plaintiff's Monell claim against the County based on excessive force fails for the

same reasons that his Monell claim against the City fails.  Plaintiff has not pointed to any formal

policy, officially promulgated or adopted by the County that led to the alleged constitutional

deprivation.  Monell, 436 U.S. at 691.  To the contrary, Plaintiff argues that Officer Ruiz violated

Westchester Department of Public Safety general orders.[16]  (Pltf. Opp. County Br. at 22)

Plaintiff has likewise not offered any evidence that the excessive force allegedly exercised by the

County Defendants was "part of a widespread practice" constituting "a custom or usage of which

a supervisor must have been aware."  City of St. Louis, 485 U.S. at 130.  Similarly, Plaintiff has

not offered evidence that any of the named defendants were authorized to set policy for the

County.  Cf. Brown, 520 U.S. 397.

   As with the City, Plaintiff has offered no evidence regarding the training – or lack

thereof – given to County police officers, nor has he offered any proof demonstrating that the

County is deliberately indifferent to the use of excessive force.  As discussed in connection with

Plaintiff's Monell claim against the City, these and the other evidentiary deficiencies cited above

---

[16]  In the event that Officer Ruiz violated the general orders, that may be evidence of excessive
force, but does not demonstrate that the County was indifferent to the use of excessive force.
See Flemming, 2008 WL 80746, at *3.

are fatal to Plaintiff's Monell claim.  See Jenkins, 478 F.3d at 95; Amnesty Am., 361 F.3d at 130; Chiaro, 2011 WL 3701804, at *6.

The County's motion for summary judgment on Plaintiff's Monell claim will be granted.[17]

## VI.   PUNITIVE DAMAGES

The County Defendants have moved for summary judgment on Plaintiff's claim for punitive damages under Section 1983 and state law.  (County Sum. J. Br. 15-17)

Although a municipality is immune from a claim for punitive damages, see City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 258-68 (1981), that immunity does not extend to a municipal official sued in his individual capacity.  See, e.g., Smith v. Wade, 461 U.S. 30, 55-56 (1983).  Punitive damages may be awarded in a Section 1983 action where a plaintiff demonstrates that "'the defendant's conduct is . . . motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others,' or, in other words, when a plaintiff has produced evidence of 'a positive element of conscious wrongdoing' or 'malice.'"  Cameron v. City of New York, 598 F.3d 50, 69 (2d Cir. 2010) (quoting New Windsor Volunteer Ambulance Corps., Inc. v. Meyers, 442 F.3d 101, 121-22 (2d Cir. 2006).  The Second Circuit has sustained punitive damage awards in Section 1983 excessive force cases involving conduct and injuries comparable to those alleged here.  Compare Pltf. Resp. to County R. 56.1. Stmt. ¶ 168 and Appx., Ex. 5 with Ismail v. Cohen, 899 F.2d. 183, 185 (2d Cir. 1990) (upholding $150,000 punitive damage award in Section 1983 action where arrestee suffered two displaced vertebrae, a cracked rib, and serious head trauma); O'Neill v. Krzeminski, 839 F.2d 9,

---

[17]  Because the Court has granted summary judgment to the County as to all of Plaintiff's claims, it does not address Plaintiff's claim for punitive damages against the County under Section 1983. The Court notes, however, that punitive damages are not available as against municipalities in Section 1983 actions.  Nimkoff v. Dollhausen, 751 F. Supp. 2d 455, 468 (E.D.N.Y. 2010) (citing City of Newport v. Fact Concerts, 453 U.S. 247, 267 (1981)).

  
13 (2d Cir. 1988) (upholding $185,000 punitive damage award where plaintiff suffered fractured nose and lacerations to head and face).  The County Defendants' motion for summary judgment as to Plaintiff's Section 1983 punitive damages claim will be granted as to the County Defendants in their official capacities, but will otherwise be denied.

Plaintiff also seeks punitive damages on his state law claims of assault and battery.  As an initial matter, any claim against the County, or against the County Defendants in their official capacities, for punitive damages based on assault and battery is barred.  See, e.g., Karoon v. New York City Transit Authority, 241 A.D.2d 323, 324 (1st Dept. 1997) ("The [New York] Court of Appeals has clearly held that the State and its political subdivisions . . . are not subject to punitive damages." (citing Sharapata v. Town of Islip, 56 N.Y.2d 332, 334 (1982)); Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 386 (1987) (citing Sharapata, 56 N.Y.2d at 338).

As to the County Defendants in their individual capacities, a plaintiff seeking punitive damages under New York law must show evidence of wrongdoing that is "'''intentional and deliberate, and has the character of outrage frequently associated with crime.'''"  Freeman v. The Port Authority of New York and New Jersey, 243 A.D.2d 409, 410 (1st Dept. 1997) (quoting Liberman v. Riverside Mem. Chapel, 225 A.D.2d 283, 291 (1st Dept. 1996) (quoting Prozeralik v. Capital Cities Commc'ns., 82 N.Y.2d 466, 479 (1993) (quoting Prosser and Keeton, Torts § 2 at 9 (5th ed. 1984)))).  New York courts have permitted punitive damages claims to proceed based on conduct not dissimilar to that alleged here.  See, e.g., Freeman, 243 A.D.2d at 411.  The County Defendants' summary judgment motion on punitive damages will be denied to the extent that it addresses Plaintiff's state law assault and battery claims against the County Defendants in their individual capacities.

## CONCLUSION

Plaintiff's motion for summary judgment (Dkt. No. 77) is denied in its entirety.

The City Defendants' motion for summary judgment (Dkt. No. 72) is granted as to (1) all Section 1983 claims against the City of New York; (2) Plaintiff's claims against NYPD Officer Nyberg; (3) Plaintiff's Section 1983 and state law claims for false arrest; (4) Plaintiff's Section 1983 and state law claims based on malicious prosecution; and is otherwise denied.

The County Defendants' motion for summary judgment (Dkt. No. 80) is granted as to (1) all Section 1983 claims against the County of Westchester; (2) Plaintiff's Section 1983 claim against County Officers Lieberman, Brady, and Pucillo for denial of access to the courts; (3) Plaintiff's state law assault and battery claims against County Officer Serlin; (4) Plaintiff's Section 1983 and state law claims for false arrest; (5) Plaintiff's Section 1983 punitive damages claims against the County and the individual County defendants in their official capacities; and (6) Plaintiff's punitive damages claim based on assault and battery, to the extent that claim is made against the County and the individual County defendants in their official capacities; and is otherwise denied.

The Clerk of the Court is directed to terminate the motions (Dkt. Nos. 72, 77, 80).

The parties are directed to comply with this Court's Individual Rules concerning the preparation of a pre-trial order. The joint pre-trial order will be filed on October 19, 2012. Motions in limine, voir dire requests, and requests to charge are due on October 19, 2012. Responsive papers, if any, are due on October 26, 2012.

Trial will commence on November 13, 2012, at 9:00 a.m.

Dated: New York, New York
     September 24, 2012

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge

43